Denisse O. Gastélum, SBN 282771
**GASTÉLUM LAW,**
**A PROFESSIONAL CORPORATION**
3767 Worsham Ave.
Long Beach, California 90808
Tel: (213) 340-6112; Fax: (213) 402-8622
Email: dgastelum@gastelumfirm.com

Christian Contreras, Esq., (SBN 330269)
Email: *CC@Contreras-Law.com*
**LAW OFFICES OF CHRISTIAN CONTRERAS**
**PROFESSIONAL LAW CORPORATION**
360 E. 2nd St., 8th Floor
Los Angeles, California 90012
Tel: (323) 435-8000; Fax: (323) 597-0101

Attorneys for Plaintiff, A.S., et al.

AARON L. TURNER-Bar No. 207837
LAW OFFICES OF AARON L. TURNER, APC
357 W. 2nd Street, Suite 10
San Bernardino, CA 92401
Tel: (909) 383-8480; Fax: (909) 383-8484
E-Mail: AlTurnerLaw@Hotmail.Com

Attorneys for Plaintiff O.C.

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| A.S., an individual,<br><br>              Plaintiff,<br><br>       v.<br><br>RIVERSIDE COUNTY SHERIFF'S DEPARTMENT; a public entity; COUNTY OF RIVERSIDE, a public entity; SHERIFF CHAD BIANCO, individually; CHRISTIAN HEIDECKER, individually; JESSICA YELENICH, individually; SENTINEL OFFENDER SERVICES, LLC, a Limited Liability Company; KARISMA VACA, an individual, and DOES 1 through 10, individually, jointly and severally,<br><br>              Defendants. | **CASE NO.: 5:24-cv-00640-SSS-SP**<br><br>**NOTICE OF LODGING CONSOLIDATED SECOND AMENDED COMPLAINT** |

**NOTICE OF LODGING CONSOLIDATED SECOND AMENDED COMPLAINT**

**TO THE HONORABLE COURT, DEFENDANTS AND ALL OTHER INTERESTED PARTIES:**

COMES NOW Plaintiff A.S., K.P., J.C., A.R., C.A., Y.V., A.M., and O.C., and hereby lodge a redlined secon  amended consolidated complaint.

Dated: March 28, 2025          **LAW OFFICES OF CHRISTIAN CONTRERAS**
                               **A PROFESSIONAL LAW CORPORATION**

By: _____
Christian Contreras, Esq.
Attorneys for Plaintiff,
A.S., et al.

2

**NOTICE OF LODGING CONSOLIDATED SECOND AMENDED COMPLAINT**

Denisse O. Gastélum, SBN 282771
**GASTÉLUM LAW,**
**A PROFESSIONAL CORPORATION**
3767 Worsham Ave.
Long Beach, California 90808
Tel: (213) 340-6112; Fax: (213) 402-8622
Email: dgastelum@gastelumfirm.com

Christian Contreras, Esq., (SBN 330269)
Email: CC@Contreras-Law.com
**LAW OFFICES OF CHRISTIAN CONTRERAS**
**PROFESSIONAL LAW CORPORATION**
360 E. 2nd St., 8th Floor
Los Angeles, California 90012
Tel: (323) 435-8000; Fax: (323) 597-0101

Attorneys for Plaintiff, A.S., et al.

AARON L. TURNER-Bar No. 207837
LAW OFFICES OF AARON L. TURNER, APC
357 W. 2nd Street, Suite 10
San Bernardino, CA 92401
Tel: (909) 383-8480; Fax: (909) 383-8484
E-Mail: AlTurnerLaw@Hotmail.Com

Attorneys for Plaintiff O.C.

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

A.S., an individual,

        Plaintiff,

    v.

RIVERSIDE COUNTY SHERIFF'S DEPARTMENT; a public entity; COUNTY OF RIVERSIDE, a public entity; SHERIFF CHAD BIANCO, individually; CHRISTIAN HEIDECKER, individually; JESSICA YELENICH, individually; SENTINEL OFFENDER SERVICES, LLC, a Limited Liability Company; KARISMA VACA, an individual, and DOES 1 through 10, individually, jointly and severally,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**CASE NO.: 5:24-cv-00640-SSS-SP**

**CONSOLIDATED SECOND AMENDED COMPLAINT**

1. Fourth Amendment Violation (42 U.S.C. § 1983);
2. Fourteenth Amendment Violation – Due Process (42 U.S.C. § 1983);
3. Failure to Intervene (42 U.S.C. § 1983)
4. Conspiracy (42 U.S.C. § 1985);
5. Municipal Liability – Unconstitutional Policies, Customs, Practices (*Monell*, 42 U.S.C. § 1983);
6. Municipal Liability – Failure to Train (*Monell*, 42 U.S.C. § 1983);
7. Supervisory Liability (42 U.S.C. § 1983);
8. Negligence;
9. Sexual Assault;
10. Violation of California Civil Code § 52.4 (Gender Violence);
11. Violation of Civil Code Section § 1708.88;
12. Violation of California Civil Code § 52.1 (Tom Bane Act)

**DEMAND FOR JURY TRIAL**

Deleted: FIRST

Deleted: &

Deleted: 1983;

Deleted: FIRST

1

CONSOLIDATED SECOND AMENDED COMPLAINT

## COMPLAINT FOR DAMAGES

**COMES NOW** Plaintiff A.S., K.P., J.C., A.R., C.A., Y.V., A.M., and O.C., and allege as follows:

## INTRODUCTION

1.     This civil rights action seeks to establish the true and unequivocal facts surrounding the heinous sexual abuse of female detainees by a correctional deputy who was assigned to be their case manager through the Riverside County Sheriff's Department (hereinafter also "RCSD"), Riverside Alternative Sentencing Program (hereinafter also "RASP"), a house arrest program.  This action also seeks to establish the true and unequivocal facts surrounding the efforts by the COUNTY and the RCSD to cover up the abuse, and worst, to silence the victims.

2.     For numerous years, RCSD Correctional Deputy CHRISTIAN HEIDECKER (hereinafter "Defendant HEIDECKER") used his position of power as a correctional deputy to sexually abuse and torment numerous female detainees, including Plaintiffs, who were under his control. The female detainees opted into RASP believing that they were being given another chance at life.  Little did they know that when Defendant HEIDECKER walked around the women's jail and singled them out as a potential RASP participant, he was targeting his next victim.

3.     When Defendant HEIDECKER was finally caught, the RCSD concocted a plan to cover up the sexual abuse and to prevent the public from hearing the victims' accounts of what Defendant HEIDECKER did to them.  This plan was orchestrated and executed by RCSD Professional Standards Bureau Correctional Sergeant JESSICA YELENICH (hereinafter "Defendant YELENICH") and the COUNTY's private attorney Nicole R. Roggeveen.[1] Two women, no less.

///

---

[1] Notably, Nicole Roggeveen is a partner at Cole | Huber LLP, where she specializes in defending law enforcement agencies when they are sued for civil rights violations. *See* https://www.colehuber.com/attorneys/nicole-r-roggeveen/

2

CONSOLIDATED SECOND AMENDED COMPLAINT

Deleted: FIRST

4.    The plan was this: Following Defendant HEIDECKER's confession to the sexual abuse on September 1, 2023, Defendant HEIDECKER agreed to turn himself in on September 15, 2023. This gave the COUNTY and RCSD fifteen (15) days exactly to silence the victims. Defendant YELENICH and Attorney Roggeveen created a list of HEIDECKER's victims and one by one they offered them money in exchange to waiving their right to sue the COUNTY and the RCSD for the sexual abuse they were forced to endure.

5.    Defendant HEIDECKER utilized abusive patterns in each interaction with all women involved. The right to be free from sexual abuse, specifically by those in law enforcement positions, is foundational and should be protected for all individuals.

### JURISDICTION AND VENUE

6.    This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourteenth Amendment to the United States Constitution, and the laws and Constitution of the State of California. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343.

7.    Venue is proper within the Central District of California pursuant to 28 U.S.C. § 1391(b)(1) and (2) because all Defendants reside within this district and the events and omissions giving rise to Plaintiffs' claims occurred within this district.

### PENDANT CLAIMS

8.    On September 13, 2023, the COUNTY's attorneys prepared a government claim on behalf of Plaintiff.  Upon information and belief, the COUNTY rejected Plaintiff's government claims soon thereafter—claims which were prepared by the COUNTY *itself* through the assistance of its attorneys.  On October 17, 2023, Plaintiff presented an amended government claim.  The amended government claim was rejected by the COUNTY on October 25, 2023.  As such, Plaintiff has complied with the California Tort Claims Act requirements with respect to their claims arising under state law. Nevertheless, Government Code section 945.9, "[a] claim arising out of an alleged sexual assault by a law enforcement officer if the alleged assault occurred while

Deleted: FIRST

3

**CONSOLIDATED SECOND AMENDED COMPLAINT**

the officer was employed by a law enforcement agency is exempted from all state and local government claim presentation requirements."

9.     With respect to these supplemental state claims, Plaintiff requests that this Court exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over such claims as they arise from the same facts and circumstances which underlie the federal claims.

**PARTIES**

**A. Plaintiff**

10.     Plaintiffs A.S., K.P., J.C., A.R., C.A., Y.V., A.M., and O.C, are and were, at all times relevant hereto, a resident of the County of Riverside, California, and was a female detainees who were a participant of the Riverside County Sheriff's Department, Riverside Alternative Sentencing Program. Plaintiff brings her claims individually on the basis of 42 U.S.C. §§ 1983 and 1988, the United States Constitution, federal and state civil rights law and California law. Plaintiffs also bring these claims as a Private Attorney General, to vindicate not only their rights, but others' civil rights of great importance.

**B. Defendants**

11.     Defendant COUNTY OF RIVERSIDE (hereinafter also "COUNTY") owns, operates, manages, directs and controls Defendant RIVERSIDE COUNTY SHERIFF'S DEPARTMENT (hereinafter also "RCSD"), also a separate public entity, which employs other Doe Defendants in this action. At all times relevant to the facts alleged herein, Defendant COUNTY was responsible for assuring that the actions, omissions, policies, procedures, practices and customs of its employees, including RCSD employees, complied with the laws and the Constitutions of the United States and of the State of California. Defendant COUNTY, through RCSD, is and was responsible for ensuring the protection and safety of all persons in the custody of the RCSD, including female detainees who participated in Riverside Alternative Sentencing Program (hereinafter also "RASP").

///

4

**CONSOLIDATED SECOND AMENDED COMPLAINT**

Deleted: FIRST

12.    Defendant CHAD BIANCO (hereinafter also "SHERIFF BIANCO"), at all times mentioned herein, is and, since November 6, 2018, has been the Sheriff-Coroner of Defendant COUNTY OF RIVERSIDE, the highest position in the COUNTY Jails. As Sheriff, Defendant BIANCO is and was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all RCSD employees and/or agents. Defendant SHERIFF BIANCO is and was charged by law with oversight and administration of the RCSD, and all corrections programs, including ensuring the safety and protection of female detainees who participated in RASP. Defendant SHERIFF BIANCO also is and was responsible for the promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of the RCSD RASP alleged herein were committed. Defendant SHERIFF BIANCO is being sued in his individual and official capacities.

13.    Defendant CHRISTIAN HEIDECKER (hereinafter also "HEIDECKER"), at all times mentioned herein, was employed by Defendant COUNTY as a correctional deputy at the RCSD, and was acting within the course and scope of that employment. At all times mentioned herein, Defendant HEIDECKER was assigned to work as a case manager for RASP, and was responsible for carrying out RCSD policies and procedures and for ensuring the protection and safety of the female detainees assigned to him. The present defendant is sued in his individual capacity for damages. At all times relevant hereto, the present defendant was acting under the color of law.

14.    Defendant JESSICA YELENICH (hereinafter also "YELENICH"), at all times mentioned herein, was employed by Defendant COUNTY as the Correctional Sergeant for the RCSD Professional Standards Bureau, and was acting within the course and scope of that employment. At all times mentioned herein, Defendant YELENICH was responsible for carrying out RCSD policies and procedures and for ensuring the protection and safety of all inmates in the custody of the RCSD, including the RASP female detainees. The present defendant is sued in his individual capacity

5

**CONSOLIDATED SECOND AMENDED COMPLAINT**

Deleted: FIRST

for damages. At all times relevant hereto, the present defendant was acting under the color of law.

15. Defendant SENTINEL OFFENDER SERVICES, LLC (hereinafter also "SENTINEL") is a Delaware limited liability company licensed to and doing business in the State of California, County of Riverside as a contracted provider of electronic monitoring devices, including radio frequency equipment (e.g., ankle monitors), global positioning system ("GPS") devices and cellular devices, to the COUNTY and RCSD. At all times relevant to the facts alleged herein, Defendant SENTINEL was responsible for assuring that the actions, omissions, policies, procedures, practices and customs of its employees complied with the laws and the Constitutions of the United States and of the State of California. Defendant SENTINEL is and was responsible for ensuring the protection and safety of all persons in the custody of the RCSD, including female detainees who participated in Riverside Alternative Sentencing Program (hereinafter also "RASP"), by ensuring that the SENTINEL electronic monitoring devices were not used as a means to violate the rights of the female detainees by the RCSD RASP correctional deputies and case managers. At all relevant times mentioned herein, Defendant SENTINEL, and its employees, agents, officers, administrators and representatives, were acting under the color of law. *See Tsao v. Desert Palace, Inc.,* 698 F.3d 1128 (9th Cir. 2012) (*Monell* also applies to suits against private entities); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)( action taken by private individuals may be "under color of state law" where there is "significant" state involvement in the action); *Melara v. Kennedy*, 541 F.2d 802, 804 (9th Cir.1976). In the § 1983 context, the Ninth Circuit has recognized a number of tests for identifying state action. *See Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir.1983) (describing the government nexus test, the joint action test, the public function test and the state compulsion test).

16. Defendant KARISMA VACA (hereinafter also "VACA"), at all times mentioned herein, was employed by Defendant SENTINEL, and was acting within the

Deleted: FIRST

6

**CONSOLIDATED SECOND AMENDED COMPLAINT**

course and scope of that employment. At all times mentioned herein, Defendant VACA was responsible for carrying out SENTINEL policies and procedures and for ensuring the protection and safety of all inmates in the custody of the RCSD, including the RASP female detainees. The present defendant is sued in her individual capacity for damages. At all times relevant hereto, the present Defendant was acting under the color of law. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)( action taken by private individuals may be "under color of state law" where there is "significant" state involvement in the action); *Melara v. Kennedy*, 541 F.2d 802, 804 (9th Cir.1976). In the § 1983 context, the Ninth Circuit has recognized a number of tests for identifying state action. *See Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir.1983) (describing the government nexus test, the joint action test, the public function test and the state compulsion test).

17.     Defendants COUNTY OF RIVERSIDE, RIVERSIDE COUNTY SHERIFF'S DEPARTMENT, SHERIFF BIANCO, HEIDECKER, and YELENICH will hereinafter be referred to as the COUNTY DEFENDANTS.

18.     Plaintiff is ignorant of the true names and capacities of Defendants DOES 1 through 10 ("DOE Defendants") and therefore sue these Defendants by such fictitious names. Plaintiff is informed and believes and thereon alleges that each Defendant so named is responsible in some manner for the injuries and damages sustained by Plaintiff as set forth herein. Plaintiff will amend the complaint to state the names and capacities of each DOE Defendant when they have been ascertained.

19.     The identities, capacities, and/or nature of involvement of the defendants sued as DOES 1 through 10 are presently unknown to Plaintiff who therefore sues these defendants by fictitious names. Plaintiff is informed, believes, and thereupon alleges that DOES 1 through 10 include individual law enforcement personnel and monitoring personnel employed by the COUNTY, RCSD, and SENTINEL, and that they were involved in some manner and are legally responsible for the wrongful acts and conduct alleged herein. Plaintiff will amend this complaint to substitute the DOE Defendants'

**Deleted: FIRST**

7

**CONSOLIDATED SECOND AMENDED COMPLAINT**

true names and capacities when they have been ascertained. Plaintiff is informed, believes, and thereupon alleges that each DOE defendant is a resident of California. Upon information and belief, DOES 1 through 10 were and still are residents of the County of Riverside, California. DOES 1 through 10 are sued in both their individual and official capacities.

20. At all relevant times, DOES 8 through 10 were managerial, supervisorial, training, and/or policymaking employees of Defendants COUNTY and SENTINEL. At the time of the incident, DOES 8 through 10 were acting under color of law within the course and scope of their duties as employees for the RCSD, COUNTY and/or SENTINEL. They had supervisorial authority over DOES 1-10, and the employees of the RCSD and SENTINEL. DOES 8 through 10 were acting with the complete authority and ratification of their principal, Defendants COUNTY and SENTINEL.

21. Each of the defendants, including the DOE defendants, caused, and is responsible for, the unlawful conduct and resulting injuries suffered by Plaintiff by, among other things, personally participating in the unlawful conduct, acting jointly, or conspiring with others who did so; by ordering, authorizing, acquiescing in, or setting in motion policies, plans, or actions that led to the unlawful conduct; by failing to take action to prevent the unlawful conduct; by failing and refusing to initiate and maintain adequate training and supervision; by failing to enact policies to address the constitutional rights of RCSD detainees despite the obvious need for such a policy; and by ratifying the unlawful conduct that occurred by agents and officers under their direction and control, including failing to take remedial or disciplinary action.

22. Plaintiff is informed and believes and thereon alleges that each of the Defendants was at all material times an agent, servant, employee, partner, joint venturer, co-conspirator, and/or alter ego of the remaining Defendants, and in doing the things herein alleged, was acting within the course and scope of that relationship. Plaintiff is further informed and believes and thereon alleges that each of the Defendants herein gave consent, aid, and assistance to each of the remaining Defendants, and ratified and/or

Deleted: FIRST

8

**CONSOLIDATED SECOND AMENDED COMPLAINT**

authorized the acts or omissions of each Defendant as alleged herein, except as may be hereinafter specifically alleged. At all material times, each Defendant was jointly engaged in tortious activity and an integral participant in the conduct described herein, resulting in the deprivation of Plaintiff's constitutional rights and other harm.

23. Plaintiff is are informed, believes, and thereupon alleges that, at all times relevant hereto, Defendants, and each of them, acted as the agents, servants, and employees of each of the other defendants.

24. In doing each of the acts and/or omissions alleged herein, Defendants, and each of them, acted within the course and scope of their employment.

25. In doing each of the acts and/or omissions alleged herein, Defendants, and each of them, acted under color of authority and/or under the color of law.

**FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF**

**A. Background Pertaining to RCSD's Riverside Alternative Sentencing Program (RASP)**

26. At all relevant times, Defendants COUNTY and RCSD operated and maintained the Riverside Alternative Sentencing Program ("RASP"). Defendant HEIDECKER was assigned to RASP as a case manager at the Coordinated Custody Management Unit in Banning, California.

27. Plaintiffs, like many other incarcerated individuals, was given another chance at life through RASP, a security electronic monitoring program. Specifically, RASP is a house arrest program that is available to people in custody either sentenced or not, pre-arraignment, or pre-conviction. Individuals who are serving time in a COUNTY jail and who have entered a plea may also participate in the RASP program, to serve their time outside of jail.

28. While participants may apply on their own accord, the COUNTY jails are constantly looking for participants to help alleviate issues with bed space. RASP staff run weekly reports to search for additional incarcerated persons to be interviewed in addition to applications. The reports consist of current incarcerated persons which have

9

**CONSOLIDATED SECOND AMENDED COMPLAINT**

**Deleted: FIRST**

been sentenced from the courts within the last week. The program is voluntary and requires the agreement of participants.

29.    RASP staff members, including Defendant HEIDECKER, have discretion to determine who may be a "good candidate," and applicants must fill out a form, which must be accepted. They are then interviewed, and finally given a checklist of items to complete before being confirmed. After a sweeping amount of required effort, clearly participants are determined to keep their spot.

30.    When someone is found eligible to participate in RASP, they are required to sign a set of terms and conditions that guide their ability to be out of jail during this time. To participate, they must agree to **ALL** the terms and conditions that are included in the Unsentenced Release Terms and Conditions Packet. If a number of any of these terms are violated, one of the repercussions includes being sent back to the COUNTY's custody. Additionally, in order for participants to live with others, not only is permission required, but the person who joins the household has a set of terms and conditions they must agree to as well.

31.    Program termination is defined explicitly in the RASP policy. Participants will be instructed to contact their case manager for further instructions upon termination from the program. Additionally, full-time participants will be transported back to the RCSD Larry D. Smith Correctional Facility to be placed back into custody.

32.    RASP participants are assigned case managers to monitor their activities. Case managers are expected to monitor the participant's activities, verify participants remain current on home monitoring fees, address issues with monitoring equipment, update client information, and verify participants comply with the terms and conditions of the program. Case managers supervise the following: entries and exits from the residence, equipment tampering and/or malfunctions, verify the participant follows their set schedule, and verify all paperwork and personal information provided by the participant is valid and current.

///

**CONSOLIDATED SECOND AMENDED COMPLAINT**

**Deleted: FIRST**

33. A visual example of the terms and conditions is listed below[2], with the actual terms that participants agree to:

**RIVERSIDE ALTERNATIVE SENTENCING PROGRAM**

**UNSENTENCED RELEASE TERMS AND CONDITIONS PACKET**

**I, <u>A.S.</u>, hereby agree to as follows:**

6. ☒ The participant's confinement time is to be spent within the interior premises of their home.

7. ☒ Participants who are post-sentence are required to stay within the interior of their home during the hours ordered by their case manager.

9. ☒ Failure to abide by these conditions may lead to removal from the program and return to custody.

14. ☒ The participant is required to obey all laws and ordinances while a member of the program.

15. ☒ The participant must comply with all terms and conditions of the program as well as any directives issued by their case manager and failure to do so will result in a return to custody.

16. ☒ The participant agrees to obey all laws, not possess drugs or narcotics, not possess any deadly weapons, and not allow anyone who is under the influence of drugs into their home.

20. ☒ The participant relinquishes their Fourth Amendment rights by allowing to be searched at any time by members of the Sheriff's Department.

23. ☒ Failure to follow these rules may result in removal from the program.

24. ☒ Participants agree to not have communication with anyone else in RASP.

28. ☒ Work schedules may only be changed with verification by the employer and approval from the SECP staff.

31. ☒ Any failure to return to the residence within the prescribed time, leaving at an unapproved time, or tampering, can be deemed as an escape from custody.

---

[2] The numbers reference the actual numbers referred to in the packet, with only some listed to highlight their significance.

11

**CONSOLIDATED SECOND AMENDED COMPLAINT**

**Deleted: FIRST**

32. ☒     Failure to operate one's equipment, or negligence in doing so, may result in the participant's return to custody.

33. ☒     I will abide by any reasonable requests and instructions related to program compliance.

/s/ *A.S.*_____

**PARTICIPANT SIGNATURE**

34.   With possibility of a better way of life awaiting participants if they sign and agree to the terms, this subjects them to being defenseless. Not only must participants confirm to abide by all the terms stated above, but by a magnitude of others. Also, because of their previous experiences of incarceration, the fear of being put back into jail is lingering. This pushed not only Plaintiffs, but other victims to be coerced, and fearful that they had to abide by the desires of Defendant HEIDECKER to remain out of jail.

35.   For Defendant HEIDECKER, this susceptibility makes these women great candidates. Not only are they confined to specific terms and conditions, but they are vulnerable due to their fear and status.

36.   Participants are given schedules, determined by their employment/student status. They are required to be in certain locations at certain times. Typically, if they are not employed/in school their "free time" can be anywhere from 7am-3pm. If they are employed, this can be adjusted to potentially twelve (12) hours outside of the home, six (6) days a week. They are required to be within the four walls of their home outside of that timeframe. At times, participants can be placed on a lockdown status for a day, where they are not able to leave their homes, if they violate program terms.

37.   Free time is adjusted at the discretion of the case manager. Additionally, scheduled free time will not be allowed beyond the maximum without a supervisor's approval.

38.   RASP is exceptionally appealing to those who wish to continue to attend

**Deleted: FIRST**

**CONSOLIDATED SECOND AMENDED COMPLAINT**

to their lives outside of the jailhouse doors, whether they be single mothers, or others looking for a fresh start. With the knowledge of such high-stakes terms, Defendant HEIDECKER was given *carte blanche* to exploit participants with the consequence of revoking participation in the program.

39.    RASP participants are monitored through a Global Positioning System (GPS), used in their ankle monitors. These systems are then monitored through Defendant SENTINEL OFFENDER SERVICES, LLC (hereinafter "SENTINEL") with whom the Riverside County Sheriff's Department contracts with.

40.    Defendant SENTINEL provides the Riverside County Sheriff's Department with GPS devices and ankle monitors. Each RASP participant is assigned a case manager, who is a correctional deputy, that manages their case while in the program. These case managers are given SENTINEL cell phones to communicate with the RASP participants. RASP participants communicate by cell phone with their case managers.

41.    Defendant KARISMA VACA was an employee with Defendant SENTINEL. She was employed by Defendant SENTINEL and was assigned to the RASP office.  She worked inside the RASP office with the other deputies, including Defendant HEIDECKER. Defendant VACA's job was to collect, monitor, oversee and audit the work issued phones from deputies within the Riverside County Sheriff's Department who were case managers in the RASP program; this included Defendant HEIDECKER's cell phone.

42.    Upon information and belief, Defendant VACA and Defendant HEIDECKER engaged in a back and forth pertaining to the collection of his SENTINEL cellular phone. Defendant HEIDECKER had texted Defendant VACA sexually explicit texts regarding having sexual relations with her. After Defendant VACA collected the phones, she feared Defendant HEIDECKER would continue to text her, which concerned her.

43.    Upon information and belief, Defendant HEIDECKER maintained a

**Deleted: FIRST**

13

**CONSOLIDATED SECOND AMENDED COMPLAINT**

romantic and sexual relationship with Defendant VACA. Defendant HEIDECKER was utilizing his romantic and sexual relations with Defendant VACA to continue to manipulate RASP participants.[3]

44.    Certainly, had Defendant VACA not engaged in romantic and sexual relations with Defendant VACA, there would be less victims of Defendant HEIDECKER. The grooming of Plaintiffs and others could have been stopped at the outset had there been no complacency by employees at SENTINEL, including Defendant VACA. More supervision by employees could have prevented this abuse. Worst yet, upon information and belief, Defendant VACA had express knowledge of Defendant HEIDECKER's plan to sexually abuse Plaintiff and she herself became part of the plan by not stopping Defendant HEIDECKER.

45.    Nevertheless, Defendant HEIDECKER used his position of power to continue his advances and abuse, and utilized his relationship with Defendant VACA, a SENTINEL employee, to continue doing so.

**B. CHRISTIAN HEIDECKER' Sexual Criminal Scheme**

46.    Defendant HEIDECKER's sexual criminal scheme was simple, but sinister. Defendant HEIDECKER, in his capacity as a RCSD deputy, coerced women participants of RASP into satisfying his sexual desires under various threats, including the threat of jail times, threat of criminal consequences, or threat of RASP revocation. Fearing going to jail or criminal consequences, women participants of RASP unwillingly complied with Defendant HEIDECKER's sexual requests and were subjected to sexual abuse by Defendant HEIDECKER.

47.    Defendant HEIDECKER, as a Riverside County Sheriff's Department deputy, was assigned as a deputy to RASP at the Coordinated Custody Management overseeing compliance of RASP terms and conditions. Defendant HEIDECKER was a case manager to many RASP participants, many of which were women.

---

[3] Indeed, the fact that Defendant HEIDECKER and Defendant VACA had a romantic relationship is based upon a reliable source.

14

**CONSOLIDATED SECOND AMENDED COMPLAINT**

Deleted: FIRST

48.    One of Defendant HEIDECKER's duties was to remain in contact with RASP participants and ensure compliance with RASP terms and conditions. RASP participants were required to communicate with Defendant HEIDECKER through text message.

49.    Defendant HEIDECKER had a specific pattern in which he utilized to take advantage of not only Plaintiffs, but of the other women involved in RASP. This pattern typically began by Defendant HEIDECKER personally choosing RASP participants then being assigned as their case manager, despite at times he communicated with women whom he was not assigned to, explaining that he was "filling in" for someone else. This contact began on his work phone, provided by Defendant SENTINEL.

50.    Following this, Defendant HEIDECKER would ask each woman to send him photos that were framed as per their agreed to terms and conditions. Sometimes it was because he needed to "see their ankle monitor," or other times he asked for photos of their face to "update their pictures on file."

51.    The conversation would then take a disturbing turn when Defendant HEIDECKER would praise the photos he received, complimenting the RASP participants outside appearance, including their feet. He would remind them of their newly found freedom with comments like "it must be good to be home" and "this program is a privilege." By utilizing terms of endearment, and reminding participants how lucky they should feel, he aimed to make these women feel seen, to make sure he had power over them soon enough.

52.    Defendant HEIDECKER would also insist on photographs of feet without socks on which was not necessary to fully depict the electronic monitor but part of Defendant HEIDECKER's sexual gratification in order to satisfy his foot fetish. [4]

53.    After the participants were thankful for his compliments, he would then ask for more photos, or go back and forth about their looks, and his attraction to them.

---

[4] It should be known that Defendant HEIDECKER has confessed to a foot fetish whereby he experiences sexual gratification from photographs depicting feet.

15

**CONSOLIDATED SECOND AMENDED COMPLAINT**

Deleted: FIRST

When the women were confused and concerned of the conversation, he reverted their concern by saying that communication on his personal phone could occur more freely.

54. Time and time again, the flirtatious means of the conversation began on his part, and he convinced RASP women participants to text him on his personal phone. This was advertised as casual, and Plaintiffs, unknowing of what was to come, agreed, in order to confirm Defendant HEIDECKER remained satisfied with her.

55. Defendant HEIDECKER would then establish "ground rules" with RASP participants as soon as these conversations moved to his personal phone. Many of the ground rules established by Defendant HEIDECKER were either illegal or not terms or conditions part of RASP, merely rules enacted by Defendant HEIDECKER to conceal his sexual criminal scheme.

56. One of Defendant HEIDECKER's ground rules was a rule to delete messages between Defendant HEIDECKER and a RASP participant. For example, if this ground rule was not followed, Defendant HEIDECKER threatened consequences including to send a sheriff deputy to the home of the RASP participant to ensure that the messaged were deleted.[5]

57. Defendant HEIDECKER explained the high-stakes nature of the conversation, making clear to Plaintiffs. how much there was to lose. Defendant HEIDECKER aimed to build rapport with RASP participants, sharing personal information in order to humanize himself and make RASP participants feel guilty about any desire to report him.

58. Defendant HEIDECKER also obtained sexual gratification from establishing dominance over the RASP participants. Once Defendant HEIDECKER was able to establish dominance, his requests became more sexual in nature.

59. Defendant HEIDECKER established his dominance through his use of

---

[5] Indeed, several of HEIDECKER's victims confirmed that this threat was actualized when all of a sudden RCSD sheriff's deputies would show up at their door immediately after the victim refused one of the sexual requests. Based thereon, there exist additional RCSD correctional deputies who participated in HEIDECKER's sexual scheme.

**CONSOLIDATED SECOND AMENDED COMPLAINT**

Deleted: FIRST

words to RASP participants. Defendant HEIDECKER would also assert his dominance by constant and multiple texts to RASP participants if they did not respond for a short period of time. Defendant HEIDECKER was aware that he could receive what he desired and had no shame in doing so. Defendant HEIDECKER would also utilize guilt to make RASP participants feel regretful if they neglected the conversation that was often one-sided.

60.    Defendant HEIDECKER's position of power forced Plaintiffs. to submit to Defendant HEIDECKER's advances to please him. Plaintiffs were vulnerable due to their status as previously incarcerated and had a loss of control at this point. If Plaintiffs were to retaliate against him, they  risked being taken off the program, as per not to not "follow the directives of her case manager," as was listed in the terms she agreed to.

61.    Once Defendant HEIDECKER was able to establish his dominance and control, Defendant HEIDECKER subjected RASP women participants to sexual abuse in the following forms:

      A. Transmitting unwanted sexual messages;

      B. Demanding sexual images;

      C. Demanding nude images;

      D. Demanding that women RASP participants to engage in sexual acts;

      E. Demanding that women RASP participants record themselves engaging in sexual acts;

      F. Demanding that women RASP participants send Defendant HEIDECKER images of themselves engaging in sexual acts;

      G. Transmitting sexual images of Defendant HEIDECKER to women RASP participants;

      H. Transmitting recordings of Defendant HEIDECKER engaging in sexual acts to women RASP participants;

62.    Defendant HEIDECKER's messages were unsolicited and RASP

17

**CONSOLIDATED SECOND AMENDED COMPLAINT**

Deleted: FIRST

participants did not consent to any of Defendant HEIDECKER's sexual advances including the transmission of sexual images. However, women RASP participants complied with Defendant HEIDECKER's under threat. Defendant HEIDECKER would threaten RASP participants with the following consequences if his sexual requests were not followed:

   A. Arrest and confinement to jail;

   B. Imposition of additional criminal charges against the RASP participant;

   C. More restrictive hours meaning that RASP participants would be confined at home for longer hours including threats of "lockdown for the rest of the day";

   D. More restrictive curfew hours meaning that RASP participants have to arrive home earlier;

   E. Termination of the RASP participant's enrollment in RASP which would lead to a return to custody.

63.    Consequently, given that women RASP participants were threatened with many threats including jail, women RASP participants, including Plaintiff, had no option but to comply with Defendant HEIDECKER's illegal and sexual demands.

64.    Central to Defendant HEIDECKER's sexual criminal scheme of the threat to RASP participants was going back to jail. Defendant HEIDECKER made it clear that if his demands were not met, Defendant HEIDECKER had the power to send RASP participants to jail.

65.    Defendant HEIDECKER admitted to these conversations with RASP participants, and that he did in fact move conversations from his Sentinel phone to his personal phone. Defendant HEIDECKER justified doing so due to the flirtatious nature of the messages. In reference to the messages sent, Defendant HEIDECKER admitted to having a foot fetish and asking RASP participants for images of their ankle monitors in order to see their feet in the photo. Additionally, Defendant HEIDECKER admitted to enhancing hours in the program and performing other favors in exchange for sexual

**Deleted: FIRST**

18

**CONSOLIDATED SECOND AMENDED COMPLAINT**

photos of the participants.

66.    Many of the RASP participants subjected to Defendant HEIDECKER's sexual criminal scheme have families, including children of their own, so the threat of going to jail was severe. All the RASP participants subject to Defendant HEIDECKER's sexual criminal scheme were desperate to stay out of jail.

**C. Plaintiffs were CHRISTIAN HEIDECKER's Victims**

    **i.    Plaintiff A.S. was One of CHRISTIAN HEIDECKER's Victims**

67.    On May 31 2023, Plaintiff A.S. enrolled in RASP, and assigned to Defendant HEIDECKER as her case manager.

68.    On June 1, 2023, communication between Plaintiff A.S. and Defendant HEIDECKER began.

69.    Defendant HEIDECKER's sexual criminal scheme was enforced against Plaintiff A.S. upon initial conversation, as he began to ask for photos, and turned the conversation into a flirtatious one with his messaging.

70.    Defendant HEIDECKER requested additional inappropriate photographs from Plaintiff A.S. and sent sexual messages insinuating his desires to engage in sexual acts with Plaintiff A.S.

71.    In exchange for photographs, Defendant HEIDECKER would grant Plaintiff A.S. maximized curfew hours. When Plaintiff A.S. did not respond as fast as Defendant HEIDECKER desired, he would send multiple threatening messages. If Plaintiff A.S. did not send Defendant HEIDECKER what he demanded, he would send threatening messages about his power to put her back in jail or use guilt to make Plaintiff A.S. feel as though she had an obligation to do so. This abuse carried on for weeks.

72.    Plaintiff A.S. was aware of the magnitude of the situation, as she expressed that if she did not do what was requested by Defendant HEIDECKER she would then be removed from RASP and transported back to a COUNTY Jail, which she feared greatly.

**CONSOLIDATED SECOND AMENDED COMPLAINT**

Deleted: FIRST

73.   August 31, 2023, was the last day that Defendant HEIDECKER and Plaintiff A.S. had contact.

### ii.   Plaintiff K.P. was One of CHRISTIAN HEIDECKER's Victims

74.   On August 7, 2023, Plaintiff K.P. enrolled in RASP. Plaintiff K.P. was initially assigned to RCSD correctional deputy/case manager Cynthia Arellano, but was soon after assigned to Defendant HEIDECKER as her case manager.

75.   Immediately thereafter, communication between Plaintiff K.P. and Defendant HEIDECKER began.

76.   On August 14, 2023, Defendant HEIDECKER's sexual criminal scheme was enforced against Plaintiff K.P. as he began to ask for photos, and turned the conversation into a flirtatious one with his messaging.

77.   After Defendant HEIDECKER maneuvered the conversation to his liking, Defendant HEIDECKER then pushed the conversation to be moved to his personal phone. After the conversation was moved to his personal phone, he laid out "ground rules" to Plaintiff K.P., explaining that she had an obligation to ensure that he was protected from being held accountable for his actions.

78.   From there, Defendant HEIDECKER had more "flexibility" to ask for additional inappropriate photographs from Plaintiff K.P. and sent sexual messages insinuating his desires to engage in sexual acts with Plaintiff K.P.

79.   In exchange for photographs, Defendant HEIDECKER would grant Plaintiff K.P. maximized curfew hours. When Plaintiff K.P. did not respond as fast as Defendant HEIDECKER desired, he would send multiple threatening messages. If Plaintiff K.P. did not send Defendant HEIDECKER what he demanded, he would send threatening messages about his power to put her back in jail or use guilt to make Plaintiff K.P. feel as though she had an obligation to do so. This abuse carried on for weeks.

80.   Plaintiff K.P. was aware of the magnitude of the situation, as she expressed that if she did not do what was requested by Defendant HEIDECKER she would then

**Deleted: FIRST**

**CONSOLIDATED SECOND AMENDED COMPLAINT**

be removed from RASP and transported back to a COUNTY Jail, which she feared greatly.

81.  Defendant HEIDECKER knew that Plaintiff K.P. was particularly susceptible and vulnerable given the fact that she was a single mother of a five-year old boy.  He knew that K.P. would do anything he demanded as she did not want to be back in jail away from her son.

82.  August 21, 2023, was the last day that Defendant HEIDECKER and Plaintiff K.P. had contact.

### iii.  Plaintiff J.C. was One of CHRISTIAN HEIDECKER's Victims

83.  On July 20, 2023, Plaintiff J.C.'s sister, A.R., was enrolled in RASP.

84.  On July 21, 2023, A.R. was assigned Defendant HEIDECKER as her case manager.

85.  On July 21, 2023, communication between A.R., Plaintiff J.C. and Defendant HEIDECKER began.

86.  Defendant HEIDECKER's sexual criminal scheme was enforced against Plaintiff J.C. upon initial conversation with her sister, A.R., as he began to ask for photos, and turned the conversation into a flirtatious one with his messaging.

87.  After Defendant HEIDECKER maneuvered the conversation to his liking, Defendant HEIDECKER then pushed the conversation to be moved to his personal phone. After the conversation was moved to his personal phone, he laid out "ground rules" to A.R. and Plaintiff J.C., explaining that she had an obligation to ensure that he was protected from being held accountable for his actions.

88.  From there, Defendant HEIDECKER had more "flexibility" to ask for additional inappropriate photographs from A.R. and Plaintiff J.C. and sent sexual messages insinuating his desires to engage in sexual acts with A.R. and Plaintiff J.C.

89.  In exchange for photographs, Defendant HEIDECKER would grant A.R. maximized curfew hours. When A.R. and Plaintiff J.C. did not respond as fast as Defendant HEIDECKER desired, he would send multiple threatening messages to both

Deleted: FIRST

21
**CONSOLIDATED SECOND AMENDED COMPLAINT**

A.R. and Plaintiff J.C. If Plaintiff J.C. did not send Defendant HEIDECKER what he demanded, he would send threatening messages about his power to put A.R. back in jail or use guilt to make Plaintiff J.C. feel as though she had an obligation to do so. This abuse carried on for weeks.

90. Plaintiff J.C. was aware of the magnitude of the situation, as she expressed that if she did not do what was requested by Defendant HEIDECKER, A.R. would then be removed from RASP and transported back to a COUNTY Jail, which she feared greatly.

91. August 30, 2023, was the last day that Defendant HEIDECKER, Plaintiff J.C. and A.R. had contact.

**iv.    Plaintiff A.R. was One of CHRISTIAN HEIDECKER's Victims**

92. On July 20, 2023, Plaintiff A.R. enrolled in RASP.

93. On July 21, 2023, Plaintiff A.R. was assigned Defendant HEIDECKER as her case manager.

94. On July 21, 2023, communication between Plaintiff A.R. and Defendant HEIDECKER began.

95. Defendant HEIDECKER's sexual criminal scheme was enforced against Plaintiff A.R. upon initial conversation, as he began to ask for photos, and turned the conversation into a flirtatious one with his messaging.

96. After Defendant HEIDECKER maneuvered the conversation to his liking, Defendant HEIDECKER then pushed the conversation to be moved to his personal phone. After the conversation was moved to his personal phone, he laid out "ground rules" to Plaintiff A.R., explaining that she had an obligation to ensure that he was protected from being held accountable for his actions.

97. From there, Defendant HEIDECKER had more "flexibility" to ask for additional inappropriate photographs from Plaintiff A.R. and sent sexual messages insinuating his desires to engage in sexual acts with Plaintiff A.R.

98. In exchange for photographs, Defendant HEIDECKER would grant

Deleted: FIRST

22

**CONSOLIDATED SECOND AMENDED COMPLAINT**

Plaintiff A.R. maximized curfew hours. When Plaintiff A.R. did not respond as fast as Defendant HEIDECKER desired, he would send multiple threatening messages. If Plaintiff A.R. did not send Defendant HEIDECKER what he demanded, he would send threatening messages about his power to put her back in jail or use guilt to make Plaintiff A.R. feel as though she had an obligation to do so. This abuse carried on for weeks.

99.    Plaintiff A.R. was aware of the magnitude of the situation, as she expressed that if she did not do what was requested by Defendant HEIDECKER she would then be removed from RASP and transported back to a COUNTY Jail, which she feared greatly.

100. August 30, 2023, was the last day that Defendant HEIDECKER and Plaintiff A.R. had contact.

**v.    Plaintiff C.A. was One of CHRISTIAN HEIDECKER's Victims**

101. In 2022, Plaintiff C.A. enrolled in RASP. Plaintiff C.A. was periodically assigned to Defendant HEIDECKER as her case manager. Immediately, communication between Plaintiff C.A. and Defendant HEIDECKER began.

102. Defendant HEIDECKER's sexual criminal scheme was enforced against Plaintiff C.A. upon initial conversation, as he began to ask for photos, and turned the conversation into a flirtatious one with his messaging.

103. Defendant HEIDECKER requested additional inappropriate photographs from Plaintiff C.A. and sent sexual messages insinuating his desires to engage in sexual acts with Plaintiff C.A.

104. In exchange for photographs, Defendant HEIDECKER would grant Plaintiff C.A. maximized curfew hours. When Plaintiff C.A. did not respond as fast as Defendant HEIDECKER desired, he would send multiple threatening messages. If Plaintiff C.A. did not send Defendant HEIDECKER what he demanded, he would send threatening messages about his power to put her back in jail or use guilt to make Plaintiff C.A. feel as though she had an obligation to do so. This abuse carried on for

**CONSOLIDATED SECOND AMENDED COMPLAINT**

Deleted: FIRST

weeks.

105.  Plaintiff C.A. was aware of the magnitude of the situation, as she expressed that if she did not do what was requested by Defendant HEIDECKER she would then be removed from RASP and transported back to a COUNTY Jail, which she feared greatly.

106.  In July of 2023,  Defendant HEIDECKER's abuse of Plaintiff C.A. halted.

**vi.    Plaintiff Y.V. was One of CHRISTIAN HEIDECKER's Victims**

107.  In September of 2023, Plaintiff Y.V. enrolled in RASP. Plaintiff Y.V. was initially assigned to RCSD correctional deputy/case manager Cynthia Arellano. Thereafter, Plaintiff Y.V. would periodically be assigned to Defendant HEIDECKER as her case manager.

108.  In March of 2023, communication between Plaintiff Y.V. and Defendant HEIDECKER began.

109.  Defendant HEIDECKER's sexual criminal scheme was enforced against Plaintiff Y.V. upon initial conversation, as he began to ask for photos, and turned the conversation into a flirtatious one with his messaging.

110.  Defendant HEIDECKER requested additional inappropriate photographs from Plaintiff Y.V. and sent sexual messages insinuating his desires to engage in sexual acts with Plaintiff Y.V.

111. In exchange for photographs, Defendant HEIDECKER would grant Plaintiff Y.V. maximized curfew hours. When Plaintiff Y.V. did not respond as fast as Defendant HEIDECKER desired, he would send multiple threatening messages. If Plaintiff Y.V. did not send Defendant HEIDECKER what he demanded, he would send threatening messages about his power to put her back in jail or use guilt to make Plaintiff Y.V. feel as though she had an obligation to do so. This abuse carried on for weeks.

112.  Plaintiff Y.V. was aware of the magnitude of the situation, as she expressed that if she did not do what was requested by Defendant HEIDECKER she would then

24

**CONSOLIDATED SECOND AMENDED COMPLAINT**

Deleted: FIRST

be removed from RASP and transported back to a COUNTY Jail, which she feared greatly.

113. In April of 2023, Defendant HEIDECKER's abuse of Plaintiff Y.V. halted.

### vii.    Plaintiff A.M. was One of CHRISTIAN HEIDECKER's Victims

114. In September of 2022, Plaintiff A.M. enrolled in RASP. Plaintiff A.M. was periodically assigned to Defendant HEIDECKER as her case manager. Immediately, communication between Plaintiff A.M. and Defendant HEIDECKER began.

115. Defendant HEIDECKER's sexual criminal scheme was enforced against Plaintiff A.M. upon initial conversation, as he began to ask for photos, and turned the conversation into a flirtatious one with his messaging.

116. Defendant HEIDECKER requested additional inappropriate photographs from Plaintiff A.M. and sent sexual messages insinuating his desires to engage in sexual acts with Plaintiff A.M.

117. In exchange for photographs, Defendant HEIDECKER would grant Plaintiff A.M. maximized curfew hours. When Plaintiff A.M. did not respond as fast as Defendant HEIDECKER desired, he would send multiple threatening messages. If Plaintiff A.M. did not send Defendant HEIDECKER what he demanded, he would send threatening messages about his power to put her back in jail or use guilt to make Plaintiff A.M. feel as though she had an obligation to do so. This abuse carried on for weeks.

118. Plaintiff A.M. was aware of the magnitude of the situation, as she expressed that if she did not do what was requested by Defendant HEIDECKER she would then be removed from RASP and transported back to a COUNTY Jail, which she feared greatly.

119. In September of 2023, Defendant HEIDECKER's abuse of Plaintiff A.M. halted.

120. On September 1, 2023, an Investigator with the Riverside County Sheriff's

Deleted: FIRST

CONSOLIDATED SECOND AMENDED COMPLAINT

Department made contact with Defendant HEIDECKER at his home. In a voluntary statement, Defendant HEIDECKER admitted to having these abusive conversations, acknowledged his sexual motivations in doing so, including his foot fetish, and admitted to enhancing hours in the program and conducting "favors" in exchange for photos from the participants.

### viii.    Plaintiff O.C. was One of CHRISTIAN HEIDECKER's Victims

121.  On or about July 24, 2023, O.C. was placed in RASP while incarcerated in the Riverside County Sheriff's Department – Larry D. Smith Correctional Facility located at 1627 S. Hargrave Avenue, Banning, CA 92220.

122.  When O.C. signed up for home monitoring while still incarcerated, Deputy HEIDECKER approached her at the jail even though she was being assisted by another deputy, and asked questions about her children, who she lived with, and if she lived alone. Not only did she tell him that she lived alone, but she was also required to give this information when she was signing up for home monitoring, rendering her vulnerable to, and at the mercy of, RCSD deputies. Deputy HEIDECKER also went into her file to obtain her cell phone number.

123.  It should be noted that Deputy HEIDECKER was not assigned as O.C.'s case manager. Nonetheless, Deputy HEIDECKER repeatedly asserted his authority over O.C.

124.  On July 24, 2023, within two hours of being placed on house arrest and after she arrived home, Deputy HEIDECKER texted O.C. from his department-issued cellular telephone. He indicated that an alert was made suggesting that O.C.'s GPS monitor was tampered with and asked O.C. to take a picture of the monitor, "Front, back, side and side."

125.  After O.C. sent a picture, Deputy HEIDECKER complimented O.C.'s tattoo and stated, "I know Deputy Arrelano is your case manager but if you need anything hit my line up and I'll try to help you out without overstepping Arrellano."

126. During this text conversation, Deputy HEIDECKER admitted that he

**Deleted: FIRST**

targeted O.C., stating, "Well I saw you [at the jail] and was instantly like wow this girl is so pretty, you stayed respectful and then that's why I asked you your charges. And got to interact with you a bit and feel you out."

127. Deputy HEIDECKER then asked O.C. for a selfie for her profile despite the fact that RCSD already had in its possession O.C.'s booking photo. Deputy HEIDECKER then told O.C., "Of course, I don't do this for most so don't screw me on this lol. Lol [a] regular photo is fine haha. But uhhh shit, you can sent [sic] a few and I'll pick the best."

128. After O.C. sent a picture of herself, Deputy HEIDECKER responded back on the department-issued cellular telephone, stating, "You're going to get me fired. My goodness." This was followed by eyeball and fire/flame emojis. He further said, "Your [sic] man is one lucky man. And I wish we could talk on my personal because damn lol haha."

129. Deputy HEIDECKER then requested that he be allowed to contact O.C. on his personal cellphone, writing, "I just don't want to get in trouble or anything like that. I've never done this before lol and I got two daughters and if anything were to happen to my job it would be so bad. But man oh man I would love to hit your line on my personal lol."

130. Within one hour of first contacting O.C. under the guise of a purported tamper alert, Deputy HEIDECKER texted O.C. from his personal cellphone and made several inappropriate and sexual comments. He asked O.C. for more pictures for his own phone, told her that he had some of his own sexual pictures that he wanted to send her, and asked if she could send him the same. O.C. told him not to send the photos.

131. Deputy HEIDECKER then asked O.C. to send another picture of her GPS monitor and said that the image had to include her entire feet and toes. Deputy HEIDECKER went on to ask O.C. if she found him attractive and then sent O.C. pictures of himself lifting weights and a fully nude photo of himself. Deputy HEIDECKER continued to ask for inappropriate and nude photos. O.C. opted instead

Deleted: FIRST

27

**CONSOLIDATED SECOND AMENDED COMPLAINT**

to send Deputy HEIDECKER non-nude, non-explicit photos.

132. Deputy HEIDECKER texted O.C. that she looked like his kid's future stepmom while continuing to send pictures of himself. Deputy HEIDECKER also continued to ask O.C. for pictures of her breasts and other sexually explicit pictures. When O.C. informed Deputy HEIDECKER that she did not feel comfortable sending him such pictures, he responded by stating, "What's the closest you're willing to show?" Deputy HEIDECKER went on to say, "And I do want you to know that you can trust me. I'm not here to hurt you or make your life harder."

133. After O.C. again expressed that she was not comfortable with sending any inappropriate pictures to him, Deputy HEIDECKER responded, "Ugh I know. That's my bad lol. Well if you're cool with it you can send me anything. I just want more of you." He then stated that he did want to send her something if she sent something "naughty" and that, "I'm sorry for asking lol. I'm sure this is just too much info but I'm horny af and I want you so freaking bad Hahahha. But I'll behave." He further indicated that he wanted to be "all over" O.C.'s breasts.

134. Deputy HEIDECKER then inappropriately and in violation of O.C.'s civil rights, sent O.C. two (2) full clear videos of himself masturbating, showing his entire face and his penis, and told O.C., "Here you go babe. In case you're horny tonight." O.C. did not respond to this text.

135. This interaction between Deputy HEIDECKER and O.C. occurred within hours of O.C.'s release on home monitoring and while in custody of the RCSD.

136. The following day — on July 25, 2023 — Deputy HEIDECKER chastised O.C. for not responding sooner to his masturbation videos. He then exhibited his authority over O.C. by indicating that he could protect her while she reported to him during her house arrest. He told O.C., "I can only help you and protect you so much." He further stated that, "…I got you and will try to protect you and make you successful on the program but you gotta 1. Help your own self out and 2. Help me help you out." He then included a winking emoji and a purple devil emoji.

28

**CONSOLIDATED SECOND AMENDED COMPLAINT**

Deleted: FIRST

137. O.C. responded, "Gotcha! But I'm curious in what ways you'd be able to help because isn't everything like super documented." Deputy HEIDECKER said, "Don't you worry about it. Lol just know I gotchu lol. Are we good tho babe ?"

138. Later that day, Deputy HEIDECKER asked O.C. if she masturbated to his videos, stating, "Mmmm did you cum good?? Do you have toys or did you use your fingers." He went on to ask O.C. for more pictures because "I lowkey wanna cum to you so fucking bad." Deputy HEIDECKER then asked O.C. if she has vibrators or dildos and if she does anal sex. In response, O.C. reminded Deputy HEIDECKER that she asked him not to send any explicit messages.

139. Undeterred by O.C.'s repeated requests that he stop sending explicit messages, Deputy HEIDECKER told O.C. that he wanted to get to know her and everything about her, stating that, with his work and custody schedule, it was hard for him to meet women and go on dates. He said that anything that they did together needed to be planned and of brief duration. Deputy HEIDECKER then said that he wanted to see "all of" O.C. and that he "loved eating ass and that fucking ass is always fun." Deputy HEIDECKER then offered to adjust O.C.'s home monitoring hours. O.C. did not respond and stopped responding to Deputy HEIDECKER's messages.

140. Deputy HEIDECKER continued his unwelcome contact with O.C. on his personal cellphone for multiple days in July and August 2023. When O.C. would not respond to his text messages, Deputy HEIDECKER made statements knowing that he had violated her rights and wanted to make sure that she would not do anything to make it "weird" at his work.

141. On July 27, 2023, at approximately 8:27 a.m., Deputy HEIDECKER contacted O.C. from a new telephone number and told her that she needed to take the BART test. Deputy HEIDECKER then contacted O.C. on his personal phone at 9:29 a.m. after he noticed that his advances were not welcomed by O.C. and stated, "Hey what's up. So I can get the hint you don't wanna talk which I'm cool with and understand completely. I just wanna make sure we are good?" Six hours later at 3:37

**CONSOLIDATED SECOND AMENDED COMPLAINT**

Deleted: FIRST

p.m., Deputy HEIDECKER texted O.C., "?. Imma leave you alone. I get the hint and I am not trying to blow you up I just am making sure we are good is all." After another 6 hours on that same day at 9:54 p.m., Deputy HEIDECKER contacted O.C. again, stating, "Hey! So once again, I don't wanna bother you or make things worse lol but all I wanna know is if we are good. You've been ignoring me and I don't want things to be awkward with work and your situation. So plz just let me know what's up."

142. At another point during that same day and after O.C. continued to not respond to Deputy HEIDECKER on his personal cell phone, he contacted her using his work cellphone and asked if she wanted him to adjust her hours on the weekend. O.C. declined.

143. On August 14, 2023, Deputy HEIDECKER texted O.C. to say good morning, and he sent a picture of himself. O.C. did not respond to this message.

144. On August 28, 2023, Deputy HEIDECKER continued to text O.C. O.C. did not respond to this message, either.

145. When O.C. appeared at Smith Correctional Facility to have her GPS monitor removed on or about August 28, 2023, Deputy HEIDECKER arranged it so that he would be the one to remove the monitor. This interaction occurred in a private room with just Deputy HEIDECKER and O.C. present. O.C. felt disgusted and unsafe as Deputy HEIDECKER touched her feet and proceeded to remove the GPS monitor

**D. CHRISTIAN HEIDECKER was Arrested and Sent to Prison for Sexual Abuse of Plaintiffs**

146. On September 1, 2023, an Investigator with the Riverside County Sheriff's Department made contact with Defendant HEIDECKER at his home. In a voluntary statement, Defendant HEIDECKER admitted to having these abusive conversations, acknowledged his sexual motivations in doing so, including his foot fetish, and admitted to enhancing hours in the program and conducting "favors" in exchange for photos from the participants.

147. Defendant HEIDECKER was arrested on September 15, 2023, and

Deleted: FIRST

30

**CONSOLIDATED SECOND AMENDED COMPLAINT**

charged with eighteen (18) felony counts for engaging in a sexual act without consent as a detention officer; forced sexual penetration; extortion; dissuading a witness; and bribery.

148. On February 26, 2023, Defendant HEIDECKER pled guilty to five (5) counts of extortion, four (4) counts of witness intimidation, and four (4) counts of bribery. Defendant HEIDECKER was sentenced to five years in prison.

**E. The COUNTY and RCSD Orchestrate a Plan to Silence the Victims By Offering Hush Money in Exchange for Waivers to Sue.**

149. On September 1, 2023, Defendant HEIDECKER confessed to sexually abusing numerous female detainees who were in his direct control and custody through RASP.

150. At the request of the COUNTY and RCSD, Defendant HEIDECKER agreed to turn himself in on September 15, 2023.

151. This fifteen (15) day gap allowed the COUNTY and the RCSD to execute a plan to cover up the sexual abuse and to prevent the public from hearing the victims' accounts of what Defendant HEIDECKER did to them. This plan was orchestrated and executed by RCSD Professional Standards Bureau Correctional Sergeant JESSICA YELENICH and the COUNTY's private attorney Nicole R. Roggeveen.

152. Defendant YELENICH and Attorney Roggeveen created a list of HEIDECKER's victims and one by one they offered them money in exchange to waiving their right to sue the COUNTY and the RCSD for the sexual abuse they were forced to endure.

153. Plaintiffs were offered several thousands of dollars to keep silent and to waive their right to sue the COUNTY and the RCSD for the sexual abuse she endured at the hands of Defendant HEIDECKER.

**F. Defendant HEIDECKER had a History of Sexual Deviancy Known to Defendants COUNTY and RCSD.**

154. Well before Defendant HEIDECKER executed his criminal sexual

31

CONSOLIDATED SECOND AMENDED COMPLAINT

Deleted: FIRST

scheme, Defendant HEIDECKER starred in a disturbing video recorded at a RCSD jail. The video was entitled "Big Dick Deputies" and Defendant HEIDECKER is clearly identified in the Big Dick Deputies video. *See* Screenshots Below[6].

 

155. Not only did Defendant HEIDECKER brazenly star in a video entitled "Big Dick Deputies," Defendant HEIDECKER recorded and starred in such video in a RCSD jail while in his RCSD uniform.

156. Upon information and belief, Defendants COUNTY and RCSD were aware of Defendant HEIDECKER starring in the "Big Dick Deputies" video, yet failed to take any actions to remediate or address Defendant HEIDECKER's involvement in the video.

157. Given that Defendants COUNTY and RCSD were well aware of the "Big Dick Deputies" video and failed to address Defendant HEIDECKER's involvement, it was foreseeable that Defendant HEIDECKER's would escalate as reflected in his criminal sexual scheme with RASP participants.

---

[6] A full Big Dick Deputies video can be found at the link below. The identities of other non-defendant deputies have been censored by Plaintiff:
https://www.dropbox.com/scl/fi/nxxln966slt408ldmn4h7/Big-Dick-Deputies-Censored-FINAL.mov?rlkey=051tdri44qptnc0smizujzh52&dl=0

32

**CONSOLIDATED SECOND AMENDED COMPLAINT**

Deleted: FIRST

**G. Defendants VACA's and SENTINEL's Conduct was the Moving Force behind Plaintiffs' Constitutional Violations**

158. Defendant SENTINEL has a storied history of providing services to Defendants RCSD and COUNTY including monitoring services which allow Defendant SENTINEL and its employees to monitor RASP participants 24/7 and exert significant control over RASP participants. Based upon Defendant SENTINEL control, and SENTINEL's employee's control, Defendant SENTINEL and VACA had control as to the conduct of RASP deputies including Defendant HEIDECKER.

159. Defendants SENTINEL's and VACA's control over the conduct of RASP deputies including Defendant HEIDECKER stemmed from Defendants SENTINEL contractual obligations and Defendant VACA's obligations while she oversaw the RASP program for an entire year before Defendant HEIDECKER was arrested.

160. As early as February 1, 2016, Defendant SENTINEL and Defendants RCSD and COUNTY entered into a binding contract whereby Defendant SENTINEL would provide a number of services to Defendants RCSD and COUNTY. The contract's scope of services provides in part:

**Exhibit A**

**SCOPE OF SERVICES**

"The CONTRACTOR [SENTINEL] must provide and maintain professional electronic monitoring/home detention equipment/services (consultation, training, 24-hour monitoring, available surplus equipment inventory, and maintenance of equipment) for offenders. The CONTRACTOR shall provide electronic monitoring· and receiving device that is capable of continuously monitoring the presence or absence of a participant. The services and equipment provided must meet performance specifications outlined in this section.

The equipment will remain the property of the CONTRACTOR at all times. • 1. CONTRACTOR will notify the COUNTY of an offender's compliance or lack thereof immediately and also in a daily progress report.

33

CONSOLIDATED SECOND AMENDED COMPLAINT

Deleted: FIRST

A. CONTRACTOR must provide a continuous radio :frequency electronic monitoring system to verify that offenders remain at home during specified time periods and **must report unauthorized absences/late returns, equipment malfunctions or tampering to COUNTY for further investigation**.

B. CONTRACTOR shall provide the equipment, computer. software ·and any other necessary items to monitor and provide case management to a population of approximately 200 – 500 offenders. CONTRACTOR will have local field personnel available for support seven days a week ..

C. CONTRACTOR must provide an active system and all equipment necessary for monitoring COUNTY offenders, including attached transmitters, breath alcohol testing devices and/or equipment installed in the offender's residence. This may· include the utilization of global positioning· system (GPS) monitoring devices for subjects the COUNTY deems necessary. Multifunctional equipment is preferred.

D. CONTRACTOR will provide case management software for administrative use by the COUNTY.

E. CONTRACTOR shall maintain a computer system at a secure location capable of receiving, storing, and disseminating the data generated by the monitoring equipment.

F. CONTRACTOR shall have a contingency plan for communication with COUNTY in the event normal communication fails. This plan must be submitted to and approved by the COUNTY within 60 days after a contract is awarded.

**G. CONTRACTOR must provide staff coverage 24 hours per day, 7 days per week to promptly detect unauthorized offender absences/late arrivals, equipment malfunctions, tampering, and to. provide independent corroboration of any reported violation.** All

34

**CONSOLIDATED SECOND AMENDED COMPLAINT**

Deleted: FIRST

inquiries from COUNTY must be responded to immediately.

H. CONTRACTOR will ensure confirmation of all reported violations prior to notifying the COUNTY. For confirmed violations, the CONTRACTOR will notify the COUNTY via e-mail or telephone

I. The CONTRACTOR will follow the established notification tree protocol for those violations defined by COUNTY as necessary. This notification tree includes telephone calls, text messages, and direct telephone confirmation which continues until acknowledged by the COUNTY.

J. CONTRACTOR administrative staff must be on call 24-hours per day to ensure system integrity and respond to and correct any system malfunction within 4 hours of occurrence.

**K. CONTRACTOR must provide computer-generated reports to COUNTY as requested. A daily report on each offender must include the date and time of the report and all monitoring information generated since the last report.** The CONTRACTOR must also provide any additional information and reports as needed by COUNTY.

L. CONTRACTOR must prepare and forward to COUNTY, notices concerning any interruption. of service, including the date and time that the interruption began, the date and time that services were restored, and proposals to rectify problems and prevent recurrence. Such notices must be

provided no later than the next business day following the interruption.

**M. CONTRACTOR must prevent unauthorized access to the data contained in the computer system by unauthorized staff or other parties.**

**N. CONTRACTOR employees monitoring the computer system must not be able to modify monitoring data or programming,** except at the

35

**CONSOLIDATED SECOND AMENDED COMPLAINT**

Deleted: FIRST

request of COUNTY, and/or authorized by management staff.

0. CONTRACTOR must provide a means of storage/retention of each offender's monitoring data for the length of the contract life. This information must be stored on a readable ·medium (e.g. magnetic tape or disk) and must be provided to COUNTY in a written and or electronic report upon request. Electronic copies of all data shall become the exclusive property of the COUNTY at the end of the contract life. •

P. CONTRACTOR must have a local project Director with experience operating programs of same size and scope."

(Emphasis added).

161. Furthermore, Section 2.1 of Exhibit A – SCOPE OF SERVICES provides that "The CONTRACTOR shall maintain a central computer system capable of receiving, storing and disseminating data generated by the monitoring equipment."

162. Upon information and belief, the scope and services in the February 1, 2016 contract were in force and effect at all relevant times for the purposes of this matter.

163. Moreover, Defendant VACA also had the ability to conduct an audit of the deputies' cell phones, including Defendant HEIDECKER's cell phone, in order to ensure compliance with RASP terms and that communications between deputies and RASP members were consistent with policy and law.

164. On or about August of 2022, Defendant VACA was designated as the representative for SENTINEL assigned to the RASP program. Defendant VACA was assigned to this position from August of 2022 to the date of Defendant HEIDECKER's arrest.

165. Based upon the contract between Defendant SENTINEL and Defendants COUNTY and RCSD, Defendant VACA had significant control over Defendant HEIDECKER's decision to violate Plaintiffs' rights. Furthermore, based upon Defendant VACA's duties and obligations which included monitoring and the ability

36

**CONSOLIDATED SECOND AMENDED COMPLAINT**

to audit deputy cell phones, Defendant VACA had significant control over Defendant HEIDECKER's decision to violate Plaintiffs' rights. Indeed, Defendant VACA also had the power to issue a negative report on any of the Plaintiffs within the program. Upon information and belief, at the direction of Defendant HEIDECKER, Defendant VACA could issue a negative report. The issuance of a negative report was used to advance Defendant HEIDECKER's criminal scheme because he used the threat of negative consequences and jail time as his biggest leverage point to satisfy his own sexual deviancy.

166.  Finally, based upon the sexual relationship between Defendant VACA and Defendant HEIDECKER as well as Defendant VACA which may have existed a year before Defendant HEIDECKER was arrested, Defendant VACA Defendant VACA had significant control over Defendant HEIDECKER's decision to violate Plaintiffs' constitutional rights.

## FIRST CLAIM FOR RELIEF

### Fourth Amendment Violation

### (42 USC § 1983)

### By Plaintiffs As Against Defendants CHRISTIAN HEIDECKER

### and DOES 1 through 5

167. Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

168.  The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Torres v. Madrid*, 592 U.S. 306, 311 (2021). "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). A seizure for the purposes of the Fourth Amendment "requires either physical force ... or, where that is absent, submission to the assertion of authority." *Torres v. Madrid*, 592 U.S. 306, 311

37

**CONSOLIDATED SECOND AMENDED COMPLAINT**

Deleted: FIRST

(2021). An officer has made a "show of authority" when an officer's words and actions would convey to a reasonable person "that he was being ordered to restrict his movement." *California v. Hodari D.*, 499 U.S. 621, 628 (1991).

169. "Beyond the specific proscription of excessive force, the Fourth Amendment generally proscribes "unreasonable intrusions on one's bodily integrity,' . . . . and other harassing and abusive behavior that rises to the level of 'unreasonable seizure.'" *Fontana v. Haskin*, 262 F.3d 871, 878–79 (9th Cir. 2001) (determining that police officer's "sexual verbal and physical predation against a handcuffed arrestee" on ride to police station violated Fourth Amendment) (citations omitted). The Fourth Amendment bars intrusion into the body "which are not justified in the circumstances, or which are made in an improper manner." *Schmerber v. California*, 384 U.S. 757, 768 (1966) ("The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State")

170. As alleged above, Defendant HEIDECKER, while acting under color of law, submitted Plaintiff to his authority as a RCSD deputy. Indeed, Defendant HEIDECKER's entire scheme was predicated on wielding his authority in order to have Plaintiff submit to his sexual demands. It was clear to Plaintiff that Defendant HEIDECKER's commands and orders restricted her movement in violation of Plaintiff's Fourth Amendment rights.

171. Furthermore, Defendant HEIDECKER's conduct also constituted an unreasonable intrusions on Plaintiff's bodily integrity in further violation of Plaintiff's Fourth Amendment rights. In fact, Defendant HEIDECKER's intrusion into Plaintiff's body were not justified under any circumstance. Clearly, Defendant HEIDECKER's intrusion into Plaintiff's body was made for the improper manner to satisfy Defendant HEIDECKER's insatiable sexual impulses.

172. As a direct and proximate result of Defendants' acts and/or omissions as set forth above, Plaintiffs herein, sustained injuries and damages.

173. The conduct of Defendant HEIDECKER entitles Plaintiff to punitive

Deleted: FIRST

damages and penalties allowable under 42 U.S.C. § 1983 and as provided by law. Plaintiff does not seek punitive damages against Defendants COUNTY and RCSD.

174.  Plaintiff is also entitled to reasonable costs and attorneys' fees under 42 U.S.C. § 1988, and other applicable United States and California codes and laws.

## SECOND CLAIM FOR RELIEF

### Fourteenth Amendment Violation – Substantive Due Process

### (42 USC § 1983)

### By Plaintiffs As Against Defendants CHRISTIAN HEIDECKER

### and DOES 1 through 5

175.  Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

176.  The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law. . ." U.S. Const., Amdt. 14, § 1. The Due Process Clause of the Fourteenth Amendment was intended to prevent government "from abusing [its] power, or employing it as an instrument of oppression." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196, 109 S. Ct. 998, 1003, 103 L. Ed. 2d 249 (1989).

177.  Under the Fourteenth Amendment's substantive due process prong, courts use the "shocks the conscience" test to determine if a violation has occurred. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). The threshold question is "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id*. at 848 n. 8. Sexual predation can be "unjustifiable by any government interest." *Fontana v. Haskin*, 262 F.3d 871, 882 n. 7 (9th Cir. 2001). Sexual predation can be an "arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice." *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (quoting *Hurtado v. California*, 110 U.S. 516, 527 (1884)).

178.  At all relevant times, Defendant HEIDECKER was acting under color of

CONSOLIDATED SECOND AMENDED COMPLAINT

**Deleted:** ///¶
///¶
///¶

**Deleted:** FIRST

law.

179. As alleged above, Defendant HEIDECKER groomed, preyed upon, and sexually exploited Plaintiff with the threat of imprisoning Plaintiff if Plaintiff did not comply with Defendant HEIDECKER's sexual demands.

180. Indeed, Defendant HEIDECKER arbitrarily abused his power as a RCSD sheriff deputy by exploiting and victimizing Plaintiff in order to satisfy his sexual predation. Defendant HEIDECKER sexually preyed upon Plaintiff and took advantage of Plaintiff's vulnerabilities.

181. Defendant HEIDECKER's conduct clearly shocks the conscience in violation of Plaintiff's Fourteenth Amendment rights.

182. As a direct and proximate result of Defendants' acts and/or omissions as set forth above, Plaintiffs herein, sustained injuries and damages.

183. The conduct of Defendant HEIDECKER entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and as provided by law. Plaintiff does not seek punitive damages against Defendants COUNTY and RCSD.

184. Plaintiff is also entitled to reasonable costs and attorneys' fees under 42 U.S.C. § 1988, and other applicable United States and California codes and laws.

### THIRD CLAIM FOR RELIEF

**Failure to Intervene**

**(42 USC § 1983)**

**By Plaintiffs As Against Defendants KARISMA VACA**

**and DOES 1 through 5**

185. Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

186. This claim for relief is brought against Defendants KARISMA VACA and RCSD Doe Deputies. While Defendant KARISMA VACA is not a RCSD law enforcement officer, Defendant KARISMA VACA was acting under color of law. Action taken by private individuals may be "under color of state law" where there is

40

**CONSOLIDATED SECOND AMENDED COMPLAINT**

Deleted: & Conspiracy

Deleted: ; 1985

Deleted: FIRST

"significant" state involvement in the action. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982); *Melara v. Kennedy*, 541 F.2d 802, 804 (9th Cir.1976). In the § 1983 context, the Ninth Circuit has recognized a number of tests for identifying state action. *See Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir.1983) (describing the government nexus test, the joint action test, the public function test and the state compulsion test).

187. The Ninth Circuit has clearly held that "police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir.2000) (citing *United States v. Koon*, 34 F.3d 1416, 1447 n. 25 (9th Cir.1994), rev'd on other grounds, 518 U.S. 81 (1996)). "[O]fficers can be held liable for failing to intercede only if they had an opportunity to intercede." *Cunningham*, 229 F.3d 1289. "[T]he constitutional right violated by the passive defendant is analytically the same as the right violated by the person who strikes the blows." *Koon*, *supra,* 34 F.3d at 1447 n. 25.[7]

188. Defendants KARISMA VACA and RCSD Doe Deputies failed to intervene or intercede when they were made aware that Defendant HEIDECKER was exploiting, abusing, and taking advantage of RASP participants.

189. Upon information and belief, Defendant KARISMA VACA knew the intimate details of Defendant HEIDECKER's criminal sexual scheme because not only was she the SENTINEL employee responsible for monitoring but because Defendant KARISMA VACA was having a sexual relationship with Defendant HEIDECKER. Indeed, Defendant VACA also had the power to issue a negative report on any of the Plaintiffs within the program. Upon information and belief, at the direction of Defendant HEIDECKER, Defendant VACA could issue a negative report. The

---

[7] While the case law generally derives from fellow officers failing to intervene in a constitutional violation, the reasoning for the holdings in *Koon* and *Cunningham* applies here. Indeed, one who is given authority may not ignore the duty imposed by their position and fail to stop another person who summarily punish a third person in their presence or otherwise within his knowledge. A failure to intervene is a neglect of duty. *See Koon,* supra,34 F.3d at 1447 n. 25 (citing *Putman v. Gerloff,* 639 F.2d 415, 423 (8th Cir. 1981)).

**CONSOLIDATED SECOND AMENDED COMPLAINT**

issuance of a negative report was used to advance Defendant HEIDECKER's criminal scheme because he used the threat of negative consequences and jail time as his biggest leverage point to satisfy his own sexual deviancy.

190. Furthermore, upon information and belief, given that Defendant KARISMA VACA was aware of Defendant HEIDECKER's sexual abuse of Plaintiffs, Defendant KARISMA VACA was mandated to report the sexual abuse as a mandated reporter. *See* Welfare and Institutions Code Section 15630(a);(b)(1). As provided in Welfare and Institutions Code Section 15630, "[a] person who has assumed full or intermittent responsibility for the care or custody of an elder or dependent adult, whether or not they receive compensation, including administrators, supervisors, and any licensed staff of a public or private facility that provides care or services for elder or dependent adults, or any elder or dependent adult care custodian, health practitioner, clergy member, or employee of a county adult protective services agency or a local law enforcement agency, is a mandated reporter."

191. Defendant KARISMA VACA had a legal mandatory obligation to report Defendant HEIDECKER's sexual abuse of Plaintiffs yet failed to do so. Therefore, Defendant KARISMA VACA and SENTINEL "controlled" Defendant HEIDECKER and Defendant HEIDECKER was "a mere conduit for carrying out [Vaca's] will."

192. Furthermore, given that Defendant HEIDECKER was a "Big Dick Deputy" and brazenly carried out his criminal sexual scheme, Plaintiff is informed and believes that other RCSD deputies were aware of Defendant HEIDECKER's criminal conduct but failed to intervene or intercede in Plaintiff's constitutional violations.

193. Plaintiff further incorporates Section G of the Factual Allegations section, ¶¶ 158-165, which further demonstrate the mechanism by which Defendant VACA's and Defendant HEIDECKER's conspiracy could be carried out.

194. As a direct and proximate result of Defendants' acts and/or omissions as set forth above, Plaintiffs herein, sustained injuries and damages.

195. Therefore, Defendant VACA's conduct was also the moving force behind

42

**CONSOLIDATED SECOND AMENDED COMPLAINT**

**Formatted:** Font: 14 pt, Font color: Text 1

**Formatted:** Font: 14 pt, Font color: Text 1

**Formatted:** Font: 14 pt, Font color: Text 1

**Deleted:** <#>Furthermore, Defendant KARISMA also entered into a conspiracy with Defendant HEIDECKER for the purpose of depriving Plaintiffs of their rights. A plaintiff asserting a § 1985(3) conspiracy claim must allege four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act by one of the conspirators in furtherance of the conspiracy; and (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. *See, eg, Sever v. Alaska Pulp Corp*., 978 F.2d 1529, 1536 (9th Cir. 1992); *Carpenters v. Scott*, 463 U.S. 825, 828-29 (1983); *Gillespie v. Civiletti*, 629 F.2d 637, 641 (9th Cir. 1980) (citing *Griffin v. Breckenridge*, 403 U.S. 88 (1971)). ¶
Upon information and belief, shortly after becoming the SENTINEL supervisor over the RASP program a year before Defendant HEIDECKER's arrest, Defendant VACA and Defendant HEIDECKER had a meeting of the minds to allow Defendant HEIDECKER to violate the constitutional rights of Plaintiffs. Defendant VACA and Defendant HEIDECKER had a meeting of the minds whereby Defendant VACA would not fulfill her obligations in order to permit Defendant HEIDECKER to engage in inappropriate conduct with RASP participants such as Plaintiffs. Defendant VACA and Defendant HEIDECKER had a common design and understanding which was executed through their positions of respective power. ¶
Defendant HEIDECKER then carried out the object of the conspiracy when he began violating Plaintiffs' constitutional rights. Defendant VACA's and Defendant HEIDECKER's conspiracy was further carried out when Defendant VACA fulfilled her end of the agreement by not reporting Defendant HEIDECKER despite monitoring the inappropriate communications between Defendant HEIDECKER and Plaintiffs. ¶
Plaintiff further incorporates Section G of the Factual Allegations section, ¶¶ 158-165, which further demonstrate the mechanism by which Defendant VACA's and Defendant HEIDECKER's conspiracy could be carried out. ¶

**Deleted:** FIRST

Plaintiffs' constitutional violations given that Plaintiffs' constitutional violations could not have occurred without Defendant VACA's conduct and participation in the conspiracy as well as her failure to intervene.

196. Accordingly, Defendants KARISMA VACA and RCSD Doe Deputies are equally as liable for Defendant HEIDECKER's violations.

197. The conduct of Defendant KARISMA VACA and RCSD Doe Deputies entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and as provided by law. Plaintiff does not seek punitive damages against Defendants COUNTY and RCSD.

198. Plaintiff is also entitled to reasonable costs and attorneys' fees under 42 U.S.C. § 1988, and other applicable United States and California codes and laws.

## FOURTH CLAIM FOR RELIEF

## Conspiracy

## (42 USC § 1985)

## By Plaintiffs As Against Defendants KARISMA VACA

## and DOES 1 through 5

199. Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

200. Defendant KARISMA also entered into a conspiracy with Defendant HEIDECKER for the purpose of depriving Plaintiffs of their rights. A plaintiff asserting a § 1985(3) conspiracy claim must allege four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act by one of the conspirators in furtherance of the conspiracy; and (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. *See, e.g., Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir. 1992); *Carpenters v. Scott*, 463 U.S. 825, 828-29 (1983); *Gillespie v. Civiletti*, 629 F.2d 637, 641 (9th Cir. 1980) (citing *Griffin v. Breckenridge*,

43

CONSOLIDATED SECOND AMENDED COMPLAINT

403 U.S. 88 (1971)).

201. Upon information and belief, as early as September of 2022, after becoming the SENTINEL supervisor over the RASP program a year before Defendant HEIDECKER's arrest, Defendant VACA and Defendant HEIDECKER had a meeting of the minds to allow Defendant HEIDECKER to violate the constitutional rights of Plaintiffs. Defendant VACA and Defendant HEIDECKER had a meeting of the minds whereby Defendant VACA would not fulfill her obligations, and even aid in potentially generating negative reports, in order to permit Defendant HEIDECKER to engage in inappropriate conduct with RASP participants such as sexually abusing Plaintiffs. Defendant VACA and Defendant HEIDECKER had a common design and understanding which was executed through their positions of respective power.

202. The purpose of the conspiracy was to violate Plaintiffs' constitutional rights in order for Defendants HEIDECKER and VACA to satisfy their own unlawful desires. Defendants HEIDECKER and VACA had discriminatory intent because they exploited Plaintiffs' protected status of women. In fact, part of the design of the conspiracy was the fact they Plaintiffs were in the RASP program and would not report the unlawful conduct in order to preserve their liberty.

203. Defendant HEIDECKER then carried out the object of the conspiracy when he began violating Plaintiffs' constitutional rights. Defendant VACA's and Defendant HEIDECKER's conspiracy was further carried out when Defendant VACA fulfilled her end of the agreement by not reporting Defendant HEIDECKER despite monitoring the inappropriate communications between Defendant HEIDECKER and Plaintiffs.

204. Plaintiff further incorporates Section G of the Factual Allegations section, ¶¶ 158-165, which further demonstrate the mechanism by which Defendant VACA's and Defendant HEIDECKER's conspiracy could be carried out.

205. As a result of Defendant VACA's and Defendant HEIDECKER's conspiracy, Plaintiffs' constitutional rights were violated.

**CONSOLIDATED SECOND AMENDED COMPLAINT**

206.  Accordingly, Defendants KARISMA VACA and RCSD Doe Deputies are equally as liable for Defendant HEIDECKER's violations.

207.  The conduct of Defendant KARISMA VACA and RCSD Doe Deputies entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and as provided by law. Plaintiff does not seek punitive damages against Defendants COUNTY and RCSD.

208.  Plaintiff is also entitled to reasonable costs and attorneys' fees under 42 U.S.C. § 1988, and other applicable United States and California codes and laws.

**FIFTH CLAIM FOR RELIEF**

**Municipal Liability – Unconstitutional Policies, Customs, Practices**

**(*Monell*, 42 U.S.C. § 1983)**

**By Plaintiffs As Against Defendants RIVERSIDE COUNTY SHERIFF'S DEPARTMENT, COUNTY OF RIVERSIDE, SENTINEL and DOES 6 through 10**

209. Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

210.  As set forth in the forgoing claims for relief, Defendant CHRISTIAN HEIDECKER and DOES 1-5, inclusive, and each of them, committed clear and well-established violations of constitutional rights against Plaintiffs within the course and scope of his employment as RCSD  deputies, under color of law.

211.  On and for some time prior to July of 2023 (and continuing to the present date), Defendants COUNTY, RCSD and DOES 6-10, acting with gross negligence and with reckless and deliberate indifference to the rights and liberties of the public in general, and of Plaintiffs, and of persons in his class, situation and comparable position in particular, knowingly maintained, enforced and applied an official recognized custom, policy, and practice of:

A. Permitting sheriff deputies, including Defendant HEIDECKER, to contact RASP participants while on duty for non-law enforcement purposes;

**CONSOLIDATED SECOND AMENDED COMPLAINT**

**Formatted:** Font: 14 pt, Font color: Text 1

**Deleted:** FOURTH

**Deleted:** FIRST

B. Permitting sheriff deputies, including Defendant HEIDECKER, to sexually groom RASP participants;

C. Permitting sheriff deputies, including Defendant HEIDECKER, to sexually prey upon RASP participants;

D. Permitting sheriff deputies, including Defendant HEIDECKER, to sexually exploit RASP participants;

E. Permitting sheriff deputies, including Defendant HEIDECKER, to take advantage of RASP participants for sexual purposes;

F. Permitting male sheriff deputies, including Defendant HEIDECKER, oversee female RASP participants;

G. Permitting sheriff deputies, including Defendant HEIDECKER, use their personal cell phones to communicate with RASP participants;

H. Permitting sheriff deputies, including Defendant HEIDECKER, to engage in sexually improper conduct while on duty such as making a video entitled "Big Dick Deputies";

I. Carrying out "cover ups" or plans to conceal misconduct by sheriff deputies, including the misconduct of Defendant HEIDECKER;

J. Encouraging and ratifying cover ups by members of the professional standards bureau, including Defendant JESSICA YELENICH;

K. Permitting members of the professional standards bureau, including Defendant JESSICA YELENICH, to pay sexual abuse victims "hush money" or insulting and demeaning sums of money in exchange for their silence concerning sheriff deputy misconduct;

L. Permitting members of the professional standards bureau, including Defendant JESSICA YELENICH, to file tort claims on behalf of sexual abuse victims to further ensure their silence concerning sheriff deputy misconduct.

Deleted: FIRST

**CONSOLIDATED SECOND AMENDED COMPLAINT**

212. The expressly adopted policies and/or widespread, well-known, and longstanding customs or practices set forth above, constitute standard operating procedures within the Defendants COUNTY and RCSD, which have directly precipitated the pervasive sexual abuse/assault against innocent members of the general public at an unignorable and unacceptable scale, not least of which resemble the egregious constitutional violations suffered by Plaintiffs.

213. Defendants COUNTY and RCSD, and individual supervisory officials thereof, whether named or unnamed, had either actual or constructive knowledge of the unconstitutional policies, practices, and/or customs set forth herein. Despite this knowledge, the Defendants COUNTY and RCSD, by and through officials with final policymaking authority, did condone, tolerate, and ratify such policies, customs, and practices, and have shown deliberate indifference to the foreseeable effects and consequences of these policies, customs, and practices with respect to the civil rights and wellbeing of the present Plaintiff, other individuals similarly situated, and the general public.

214. The vile sexual exploitation and abuse of Plaintiffs suffered due to the conduct of Defendants HEIDECKER and DOES 1-5, inclusive, caused Plaintiffs to have significant psychological injuries. As a direct consequence of these injuries, Plaintiffs suffered and continue to suffer severe mental, and emotional anguish, as well as extensive hardship.

215. Furthermore, Plaintiff also alleges that Defendants SENTINEL and DOES 6-10 is liable under municipal liability. In *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012), the Ninth Circuit held that *Monell* also applies to suits against private entities.

216. On and for some time prior to July of 2023 (and continuing to the present date), Defendants SENTINEL and DOES 6-10, acting with gross negligence and with reckless and deliberate indifference to the rights and liberties of the public in general, and of Plaintiffs, and of persons in his class, situation and comparable position in

Deleted: FIRST

particular, knowingly maintained, enforced and applied an official recognized custom, policy, and practice of:

    A. Permitting employees, including Defendant VACA, to ignore improper communications on SENTINEL cellular phones;

    B. Permitting employees, including Defendant VACA, to ignore sexual communications between RCSD deputies and RASP participants on SENTINEL cellular phones;

    C. Permitting employees, including Defendant VACA, to fail to report improper communications on SENTINEL cellular phones;

    D. Permitting employees, including Defendant VACA, to fail to report sexual communications between RCSD deputies and RASP participants on SENTINEL cellular phones;

    E. Permitting employees, including Defendant VACA, to have romantic relations with RCSD deputies;

    F. Permitting employees, including Defendant VACA, to have sexual relations with RCSD deputies;

    G. Permitting employees, including Defendant VACA, to threaten people under SENTINEL's care such as Plaintiff with negative consequences such as jail time or revocation of RASP participation.

217. The expressly adopted policies and/or widespread, well-known, and longstanding customs or practices set forth above, constitute standard operating procedures within the Defendants SENTINEL and DOES 6-10, which have directly precipitated the pervasive sexual abuse/assault against innocent members of the general public at an unignorable and unacceptable scale, not least of which resemble the egregious constitutional violations suffered by Plaintiffs.

218. In terms of duration, frequency, and severity of the foregoing policies, given that Defendant VACA was assigned as the supervisor for SENTINEL overseeing

**CONSOLIDATED SECOND AMENDED COMPLAINT**

Deleted: ;

Deleted: FIRST

RASP a year before Defendant HEIDECKER's arrest, constitutional violations occurred for an extended period of time. In fact, Defendant HEIDECKER's reign of terror, with the assistance of Defendant VACA, occurred for at least three (3) months.

219.    Defendants SENTINEL and DOES 6-10, and individual supervisory officials thereof, whether named or unnamed, had either actual or constructive knowledge of the unconstitutional policies, practices, and/or customs set forth herein. Despite this knowledge, the Defendants SENTINEL and DOES 6-10, by and through officials with final policymaking authority, did condone, tolerate, and ratify such policies, customs, and practices, and have shown deliberate indifference to the foreseeable effects and consequences of these policies, customs, and practices with respect to the civil rights and wellbeing of the present Plaintiff, other individuals similarly situated, and the general public.

220.    The vile sexual exploitation and abuse of Plaintiffs suffered due to the conduct of Defendants VACA and DOES 1-5, inclusive, caused Plaintiffs to have significant psychological injuries. As a direct consequence of these injuries, Plaintiffs suffered and continue to suffer severe mental, and emotional anguish, as well as extensive hardship.

221.    In terms of Defendant SENTINEL and prior instances of unconstitutional customs and practices, SENTINEL has faced countless lawsuits for violating the rights of individuals by virtue of threatening to revoke their probation and jail people under their supervision. On August 21, 2017, Judge Richard W. Story of the United States District Court for the Northern District of Georgia, Gainesville Division, granted a motion for final approval of a class action settlement stemming from Defendant SENTINEL violating the constitutional rights of 276 people.[8] The case stemmed from a class action filed on February 17, 2016 against Defendant SENTINEL where Defendant SENTINEL, among other things, made threats to jail people under their

---

[8] A copy of the order can be found at the following link:
https://trellis.law/doc/district/1160003/luse-v-sentinel-offender-services-llc

49

**CONSOLIDATED SECOND AMENDED COMPLAINT**

supervision if they did not pay fees owed to SENTINEL. Given that Defendant SENTINEL has the major responsibility of overseeing people on probation and parole including people with GPS tracking, Defendant SENTINEL has a history of threatening people under their care with jail time.

222. Accordingly, the policies, practices, and/or customs implemented, maintained, or still tolerated by Defendants COUNTY, RCSD, SENTINEL, or final policymakers thereof, are so inextricably connected to the unconstitutional conduct that Plaintiffs has endured as to be a substantial moving force behind it.

223. Clearly, Defendants COUNTY, RCSD, SENTINEL's unconstitutional customs and practices was the moving force which caused Plaintiff's injuries. Therefore, Defendants COUNTY, RCSD, SENTINEL must be regarded as similarly liable for all claims raised herein against its employees, agents, and/or representatives under 42 U.S.C. § 1983.

224. As a direct and proximate result of Defendants COUNTY, RCSD, SENTINEL's acts and/or omissions as set forth above, Plaintiff herein, sustained injuries and damages.

225. Plaintiff is also entitled to reasonable costs and attorneys' fees under 42 U.S.C. § 1988, and other applicable United States and California codes and laws.

**SIXTH CLAIM FOR RELIEF**

**Municipal Liability – Failure to Train**

**(*Monell*, 42 U.S.C. § 1983)**

**By Plaintiffs As Against Defendants RIVERSIDE COUNTY SHERIFF'S**

**DEPARTMENT, COUNTY OF RIVERSIDE, SENTINEL**

**and DOES 6 through 10**

226. Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

227. As set forth in the herein, Defendants HEIDECKER, VACA and DOES 1-5, inclusive, and each of them, committed clear and well-established violations of

50

**CONSOLIDATED SECOND AMENDED COMPLAINT**

Deleted: ///¶

Deleted: FIFTH

Deleted: FIRST

constitutional rights against Plaintiffs within the course and scope of their employment as RCSD deputies and SENTINEL employees, under color of law.

228. The training of Defendants HEIDECKER, VACA and DOES 1-5, inclusive, by the Defendants COUNTY, RCSD and SENTINEL did not adequately instill the necessary discipline, restraint, competence, and respect for civil rights required of armed law enforcement personnel and employees carrying out certain law enforcement functions. In particular, the training of Defendants HEIDECKER, VACA and DOES 1-5, inclusive, in terms of communicating with RASP participants and sexual abuse relative to RASP participants was in violation of the Fourth and Fourteenth Amendments to the United States Constitution, and was manifestly inadequate.

229. The critical need for discipline, restraint, and competence on the part of law enforcement and employees carrying out law enforcement functions was and is, or reasonably should have been, well-known to the Defendants COUNTY, RCSD and SENTINEL well before the rights of Plaintiffs were violated.

230. In fact, Defendants COUNTY, RCSD and SENTINEL failed to train its employees in the following regard:

    A. Permitting sheriff deputies, including Defendant HEIDECKER, to contact RASP participants while on duty for non-law enforcement purposes;

    B. Permitting sheriff deputies, including Defendant HEIDECKER, to sexually groom RASP participants;

    C. Permitting sheriff deputies, including Defendant HEIDECKER, to sexually prey upon RASP participants;

    D. Permitting sheriff deputies, including Defendant HEIDECKER, to sexually exploit RASP participants;

    E. Permitting sheriff deputies, including Defendant HEIDECKER, to take advantage of RASP participants for sexual purposes;

51

**CONSOLIDATED SECOND AMENDED COMPLAINT**

Deleted: ///¶

Deleted: FIRST

F. Permitting male sheriff deputies, including Defendant HEIDECKER, oversee female RASP participants;

G. Permitting sheriff deputies, including Defendant HEIDECKER, use their personal cell phones to communicate with RASP participants;

H. Permitting sheriff deputies, including Defendant HEIDECKER, to engage in sexually improper conduct while on duty such as making a video entitled "Big Dick Deputies";

I. Carrying out "cover ups" or plans to conceal misconduct by sheriff deputies, including the misconduct of Defendant HEIDECKER;

J. Encouraging and ratifying cover ups by members of the professional standards bureau, including Defendant JESSICA YELENICH;

K. Permitting members of the professional standards bureau, including Defendant JESSICA YELENICH, to pay sexual abuse victims "hush money" or insulting and demeaning sums of money in exchange for their silence concerning sheriff deputy misconduct;

L. Permitting members of the professional standards bureau, including Defendant JESSICA YELENICH, to file tort claims on behalf of sexual abuse victims to further ensure their silence concerning sheriff deputy misconduct.

M. Permitting employees, including Defendant VACA, to ignore improper communications on SENTINEL cellular phones;

N. Permitting employees, including Defendant VACA, to ignore sexual communications between RCSD deputies and RASP participants on SENTINEL cellular phones;

O. Permitting employees, including Defendant VACA, to fail to report improper communications on SENTINEL cellular phones;

**Deleted:** ///¶

**Deleted:** FIRST

52

**CONSOLIDATED SECOND AMENDED COMPLAINT**

P. Permitting employees, including Defendant VACA, to fail to report sexual communications between RCSD deputies and RASP participants on SENTINEL cellular phones;

Q. Permitting employees, including Defendant VACA, to have romantic relations with RCSD deputies;

R. Permitting employees, including Defendant VACA, to have sexual relations with RCSD deputies; and

S. Permitting employees, including Defendant VACA, to threaten people under SENTINEL's care such as Plaintiff with negative consequences such as jail time or revocation of RASP participation.

231. Therefore, despite the resounding need for improved or further training, both in general and with respect to Defendants HEIDECKER, VACA and DOES 1-5, inclusive, Defendants COUNTY, RCSD and SENTINEL have allowed, if not encouraged, a culture of deliberate indifference to the rights and wellbeing of the public to develop within their respective work forces, thereby substantially causing the present Plaintiff, and countless others like her, to suffer extensive and irreversible violations of their civil rights, including but not limited to the freedom from unreasonable search and freedom to be free from unconscionable governmental action.

232. In terms of duration, frequency, and severity of the foregoing policies, given that Defendant VACA was assigned as the supervisor for SENTINEL overseeing RASP a year before Defendant HEIDECKER's arrest, constitutional violations occurred for an extended period of time. In fact, Defendant HEIDECKER's reign of terror, with the assistance of Defendant VACA, occurred for at least three (3) months

233. In terms of Defendant SENTINEL and prior instances of unconstitutional customs and practices, SENTINEL has faced countless lawsuits for violating the rights of individuals by virtue of threatening to revoke their probation and jail people under their supervision. On August 21, 2017, Judge Richard W. Story of the United States District Court for the Northern District of Georgia, Gainesville Division, granted a

53

**CONSOLIDATED SECOND AMENDED COMPLAINT**

motion for final approval of a class action settlement stemming from Defendant SENTINEL violating the constitutional rights of 276 people.[9] The case stemmed from a class action filed on February 17, 2016 against Defendant SENTINEL where Defendant SENTINEL, among other things, made threats to jail people under their supervision if they did not pay fees owed to SENTINEL. Given that Defendant SENTINEL has the major responsibility of overseeing people on probation and parole including people with GPS tracking, Defendant SENTINEL has a history of threatening people under their care with jail time.

234. Furthermore, Plaintiffs allege that the failure to train was not solely for Defendant VACA, but rather, for all SENTINEL employees who were assigned to the RCSD.

235. Moreover, under the failure to train theory, a pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. *Connick v. Thompson*, 563 U.S. 51, 62 (2011). However, a pattern is not necessary when the unconstitutional consequences of failing to train is so patently obvious that a city could be liable under Section 1983 without proof of a pre-existing pattern of violations. See City of Canton, 489 U.S. at 390 (finding that when the "need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need"). Here, it is so patently that Defendants' training policies were inadequate given the egregiousness of Defendant HEIDECKER's and VACA's conduct. In fact, the constitutional consequences in failing to train employees on sexual abuse on behalf of deputies and vulnerable women is obvious that a sexual deviant such as Defendant HEIDECKER would violate Plaintiffs' rights.

---

[9] A copy of the order can be found at the following link: https://trellis.law/doc/district/1160003/luse-v-sentinel-offender-services-llc

**CONSOLIDATED SECOND AMENDED COMPLAINT**

236. Clearly, Defendants COUNTY, RCSD and SENTINEL have shown a conscience-shocking level of deliberate indifference to the manifest, systemic consequences of the referenced training failures and other departmental shortcomings. These training failures directly produced the incompetence and impropriety of Defendants HEIDECKER, VACA and DOES 1-5, inclusive,, inclusive, by which the present Plaintiff's civil rights were violated.

237. Accordingly, the training failures of the Defendants COUNTY, RCSD and SENTINEL are so inextricably connected to the unconstitutional conduct that Plaintiff has endured as to be a substantial moving force behind it. Therefore, the Defendants COUNTY, RCSD and SENTINEL must be regarded as similarly liable for all claims raised herein against its employees, agents, or representatives under 42 U.S.C. § 1983.

238. The vile sexual exploitation and abuse of Plaintiffs suffered due to the conduct of Defendants HEIDECKER VACA and DOES 1-5, inclusive, caused Plaintiffs to have significant psychological injuries. As a direct consequence of these injuries, Plaintiffs suffered and continue to suffer severe mental, and emotional anguish, as well as extensive hardship.

239. As a direct and proximate result of Defendants COUNTY, RCSD, SENTINEL's acts and/or omissions as set forth above, Plaintiff herein, sustained injuries and damages.

240. Accordingly, Defendants COUNTY, RCSD, SENTINEL's failure to train its employees is so inextricably connected to the unconstitutional conduct that Plaintiffs has endured as to be a substantial moving force behind it.

241. Plaintiff is also entitled to reasonable costs and attorneys' fees under 42 U.S.C. § 1988, and other applicable United States and California codes and laws.

///

///

///

**CONSOLIDATED SECOND AMENDED COMPLAINT**

Deleted: ///¶

Formatted: No bullets or numbering

Deleted: FIRST

**SEVENTH CLAIM FOR RELIEF**

**Supervisory Liability**

**(42 U.S.C. § 1983)**

**By Plaintiffs As Against Defendants SHERIFF BIANCO, JESSICA YELENICH and DOES 6 through 10**

242. Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

243. At all material times, Defendants SHERIFF CHAD BIANCO, JESSICA YELENICH and DOES 8 through 10 had the duty and responsibility to constitutionally hire, train, instruct, monitor, supervise, evaluate, investigate, staff, and discipline the other Defendants employed by their respective agencies in this matter, as well as all employees and agents of the COUNTY and RCSD.

244. Defendants SHERIFF CHAD BIANCO, JESSICA YELENICH and DOES 8 through 10 failed to properly hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline the respective employees of their agencies, including Defendant HEIDECKER and RCSD personnel, with deliberate indifference to Plaintiffs', and others' constitutional rights, which were thereby violated as described above.

245. As supervisors, Defendants SHERIFF CHAD BIANCO, JESSICA YELENICH and DOES 8 through 10 each permitted and failed to prevent the unconstitutional acts of other Defendants and individuals under their supervision and control, and failed to properly supervise such individuals, with deliberate indifference to the rights to safety and protections while under enrolled in RASP. Each of these supervising Defendants either directed his or her subordinates in conduct that violated Plaintiffs' rights, or set in motion a series of acts and omissions by his or her subordinates that the supervisor knew or reasonably should have known would deprive Plaintiffs of rights, or knew his or her subordinates were engaging in acts likely to deprive Plaintiffs of rights and failed to act to prevent his or her subordinate from

**CONSOLIDATED SECOND AMENDED COMPLAINT**

Deleted: SIXTH

Deleted: FIRST

engaging in such conduct, or disregarded the consequence of a known or obvious training deficiency that he or she must have known would cause subordinates to violate Plaintiffs' rights, and in fact did cause the violation of Plaintiffs rights. (*See* Ninth Circuit Model Civil Jury Instruction 9.4). Furthermore, each of these supervising Defendants is liable in their failures to intervene in their subordinates' apparent violations of Plaintiffs' rights.

246. The unconstitutional actions and/or omissions of Defendants HEIDECKER and 1 through 10, and other COUNTY and RCSD personnel, as described above, were approved, tolerated, and/or ratified by policymaking officers for the COUNTY and RCSD, including Defendants SHERIFF CHAD BIANCO, JESSICA YELENICH and DOES 8 through 10.

247. Plaintiff is informed and believes and thereon alleges that the details of this incident have been revealed to Defendants SHERIFF CHAD BIANCO, JESSICA YELENICH and DOES 8 through 10 and that such Defendant-policymakers have direct knowledge of the fact that HEIDECKER was sexually abusing and preying upon RASP participants, but continued to carry out their duties and responsibilities with deliberate indifference to Plaintiffs' rights to be protected from sexual abuse and conduct which shocked the conscious while a RASP participants as set forth above.

248. Notwithstanding this knowledge, on information and belief, Defendants SHERIFF CHAD BIANCO, JESSICA YELENICH and DOES 8 through 10 have approved and ratified of the conduct and decisions of Defendants HEIDECKER and DOES 1 through 5 in this matter, and have made a deliberate choice to endorse such conduct and decisions, and the basis for them, that resulted in the sexual abuse of Plaintiffs. By so doing, Defendants SHERIFF CHAD BIANCO, JESSICA YELENICH and DOES 8 through 10 have shown affirmative agreement with the individual Defendants' actions and have ratified the unconstitutional acts of the individual Defendants.

249. Furthermore, Plaintiffs are informed and believe, and thereupon allege,

**Deleted: FIRST**

57

**CONSOLIDATED SECOND AMENDED COMPLAINT**

that Defendants SHERIFF CHAD BIANCO, JESSICA YELENICH and DOES 8 through 10 and other policymaking officers for the COUNTY and RCSD were and are aware of a pattern of misconduct and injury, and a code of silence, caused by COUNTY and RCSD deputies similar to the conduct of Defendants described herein, but failed to discipline culpable law enforcement officers and employees and failed to institute new procedures and policy within the COUNTY and RCSD.

250. Defendants subjected Plaintiffs  to their wrongful conduct, depriving Plaintiffs of rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Plaintiffs and others would be violated by their acts and/or omissions.

251.  As a direct and proximate result of the unconstitutional actions, omissions, customs, policies, practices, and procedures of Defendants SHERIFF CHAD BIANCO, JESSICA YELENICH and DOES 8 through 10 as described above, Plaintiff sustained serious and permanent injuries and is entitled to damages, penalties, costs, and attorneys' fees.

**EIGHTH CLAIM FOR RELIEF**

**Negligence**

**By Plaintiffs As Against All Defendants, Save SHERIFF BIANCO and JESSICA YELENICH**

252. Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

253.  The present claim for relief is brought pursuant to Cal. Gov. Code §§ 815.2 and 820. Under § 820 of the Government Code, as public employees, Defendant HEIDECKER is liable for injuries caused by his acts or omissions to the same extent as private persons. Under § 815.2 of the Government Code, as public entities, RCSD and COUNTY are liable for injuries caused by the acts or omissions of their employees committed within the course and scope of their employment. This claim for relief is not alleging direct liability against RCSD and COUNTY, only vicarious liability. *See*

Deleted: SEVENTH

Deleted: FIRST

58

**CONSOLIDATED SECOND AMENDED COMPLAINT**

Gov. Code, § 815.2, subds. (a), (b); *see also Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1128.

254. The present claim for relief is brought is also brought against Defendant VACA and by virtue of Defendant VACA's employment, Defendant SENTINEL as well.

255. At all times, Defendants HEIDECKER, VACA and DOES 1-10 owed Plaintiffs a duty to use reasonable care.

256. These general duties of reasonable care and due care owed to Plaintiffs by Defendant HEIDECKER include but are not limited to the following specific obligations:

    A. Contacting RASP participants while on duty for non-law enforcement purposes;

    B. Sexually grooming RASP participants;

    C. Sexually preying upon RASP participants;

    D. Sexually exploiting RASP participants;

    E. Taking advantage of RASP participants for sexual purposes;

    F. Improperly overseeing female RASP participants;

    G. Using personal cell phones to communicate with RASP participants;

    H. Engaging in sexually improper conduct while on duty such as making a video entitled "Big Dick Deputies"

257. These general duties of reasonable care and due care owed to Plaintiffs by Defendant VACA include but are not limited to the following specific obligations:

    A. Ignoring improper communications on SENTINEL cellular phones;

    B. Ignoring sexual communications between RCSD deputies and RASP participants on SENTINEL cellular phones;

    C. Failing to report improper communications on SENTINEL cellular phones;

///

59

**CONSOLIDATED SECOND AMENDED COMPLAINT**

D. Failing to report sexual communications between RCSD deputies and RASP participants on SENTINEL cellular phones;

E. Having a romantic relations with RCSD deputies; and

F. Having a sexual relations with RCSD deputies.

258. Defendants HEIDECKER, VACA and DOES 1-10 through their acts and omissions, breached each and every one of the aforementioned duties owed to Plaintiffs.

259. As a direct and proximate result of these Defendants HEIDECKER, VACA's negligence, Plaintiffs sustained injuries and damages.

260. Defendants RCSD and COUNTY are vicariously liable for the violations of state law and conduct of their officers, employees, and agents, including individual named defendants, under California Government Code § 815.2.

261. Defendant SENTINEL is liable for Defendant VACA's conduct under the doctrine of *respondent superior*. *See Perez v. Van Groningen & Sons ,Inc.* (1986) 41 Cal.3d 962, 967.

### NINTH CLAIM FOR RELIEF

#### Sexual Assault

#### By Plaintiffs As Against Defendant COUNTY, RCSD, & HEIDECKER

262. Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

263. The present claim for relief is brought pursuant to Cal. Gov. Code §§ 815.2 and 820. Under § 820 of the Government Code, as public employees, Defendant HEIDECKER is liable for injuries caused by his acts or omissions to the same extent as private persons. Under § 815.2 of the Government Code, as public entities, RCSD and COUNTY are liable for injuries caused by the acts or omissions of their employees committed within the course and scope of their employment. This claim for relief is not alleging direct liability against RCSD and COUNTY, only vicarious liability. *See*

60

**CONSOLIDATED SECOND AMENDED COMPLAINT**

Deleted: ///¶

Deleted: EIGHTH

Deleted: FIRST

Gov. Code, § 815.2, subds. (a), (b); *see also Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1128.

264.   As alleged herein, Defendant HEIDECKER sexually assaulted Plaintiffs' by intending to cause a harmful and offensive contact with Plaintiffs' intimate body parts. Further, Defendant HEIDECKER also caused an imminent fear of a harmful or offensive contact with Plaintiffs' intimate body parts. Clearly, Defendant HEIDECKER' intent was to cause a harmful or offensive contact with Plaintiff's body in a sexual manner.

265.   Plaintiff Plaintiffs did not consent to the  harmful or offensive contact.

266.   As a direct and proximate result of these Defendant HEIDECKER and DOES 1-10' conduct, Plaintiffs sustained injuries  and damages.

267.   The conduct of Defendant HEIDECKER entitles Plaintiff to punitive damages and penalties as provided by law. Plaintiff does not seek punitive damages against Defendants RCSD and COUNTY.

268.   Defendants RCSD and COUNTY are vicariously liable for the violations of state law and conduct of their officers, employees, and agents, including individual named defendants, under California Government Code § 815.2.

**TENTH CLAIM FOR RELIEF**

**Violation of California Civil Code § 52.4**

**(Gender Violence)**

**By Plaintiffs As Against Defendant COUNTY, RCSD, & HEIDECKER**

269. Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

270.   The present claim for relief is brought pursuant to Cal. Gov. Code §§ 815.2 and 820. Under § 820 of the Government Code, as public employees, Defendant HEIDECKER is liable for injuries caused by his acts or omissions to the same extent as private persons. Under § 815.2 of the Government Code, as public entities, RCSD and COUNTY are liable for injuries caused by the acts or omissions of their employees

| Deleted: NINTH |

| Deleted: FIRST |

61

committed within the course and scope of their employment. This claim for relief is not alleging direct liability against RCSD and COUNTY, only vicarious liability. *See* Gov. Code, § 815.2, subds. (a), (b); *see also Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1128.

271. As alleged herein, Defendant HEIDECKER sexually assaulted Plaintiffs' by intending to cause a harmful and offensive contact with Plaintiffs' intimate body parts. Further, Defendant HEIDECKER also caused an imminent fear of a harmful or offensive contact with Plaintiffs' intimate body parts. Clearly, Defendant HEIDECKER' intent was to cause a harmful or offensive contact with Plaintiff's body in a sexual manner.

272. Pursuant to Civil Code § 52.4, for purposes of this section, "gender violence" is a form of sex discrimination and means either of the following:

(1) One or more acts that would constitute a criminal offense under state law that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, committed at least in part based on the gender of the victim, whether or not those acts have resulted in criminal complaints, charges, prosecution, or conviction.

(2) A physical intrusion or physical invasion of a sexual nature under coercive conditions, whether or not those acts have resulted in criminal complaints, charges, prosecution, or conviction.

273. On March 7, 2024, Defendant HEIDECKER was convicted of multiple felonies for his sexual criminal conduct against RASP participants including Plaintiffs and such conduct is gender violence within the meaning of Civil Code § 52.4.

274. Furthermore, Defendant ADAM VILLALOBOS committed a physical intrusion or physical invasion sexual in nature as detailed herein. The conditions of such physical intrusion or physical invasion were coercive because Defendant HEIDECKER was a sheriff deputy wielding disproportionate power over RASP participants including Plaintiffs. Such conduct is gender violence within the meaning

**CONSOLIDATED SECOND AMENDED COMPLAINT**

**Deleted: FIRST**

of Civil Code § 52.4.

275.  As a direct and proximate result of these Defendant HEIDECKER and DOES 1-10' conduct, Plaintiffs sustained injuries  and damages.

276.  The conduct of Defendant HEIDECKER entitles Plaintiff to punitive damages and penalties as provided by law. Plaintiff does not seek punitive damages against Defendants RCSD and COUNTY.

277.  Defendants RCSD and COUNTY are vicariously liable for the violations of state law and conduct of their officers, employees, and agents, including individual named defendants, under California Government Code § 815.2.

**ELEVENTH CLAIM FOR RELIEF**

**Violation of Civil Code Section § 1708.88**

**By Plaintiffs As Against Defendant COUNTY, RCSD, & HEIDECKER**

278. Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

279.  The present claim for relief is brought pursuant to Cal. Gov. Code §§ 815.2 and 820. Under § 820 of the Government Code, as public employees, Defendant HEIDECKER is liable for injuries caused by his acts or omissions to the same extent as private persons. Under § 815.2 of the Government Code, as public entities, RCSD and COUNTY are liable for injuries caused by the acts or omissions of their employees committed within the course and scope of their employment. This claim for relief is not alleging direct liability against RCSD and COUNTY, only vicarious liability. *See* Gov. Code, § 815.2, subds. (a), (b); *see also Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1128.

280.  In July of 2023 through August of 2023, Defendant HEIDECKER violated Civil Code Section § 1708.88 when he knowingly sent Plaintiffs images, which he knew was unsolicited, by electronic means, depicting obscene material.

281.  As a direct and proximate result of these Defendant HEIDECKER and DOES 1-10' conduct, Plaintiffs sustained injuries and damages.

63

**CONSOLIDATED SECOND AMENDED COMPLAINT**

**Formatted:** No bullets or numbering

**Deleted:** ///¶
///¶

**Deleted:** TENTH

**Deleted:** FIRST

282. The conduct of Defendant HEIDECKER entitles Plaintiff to punitive damages and penalties as provided by law. Plaintiff does not seek punitive damages against Defendants RCSD and COUNTY.

283. Defendants RCSD and COUNTY are vicariously liable for the violations of state law and conduct of their officers, employees, and agents, including individual named defendants, under California Government Code § 815.2.

**TWELFTH CLAIM FOR RELIEF**

**Violation of California Civil Code § 52.1**

**(Tom Bane Act)**

**By Plaintiffs As Against All Defendants, Save SHERIFF BIANCO and JESSICA YELENICH**

284. Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

285. The present claim for relief is brought pursuant to Civil Code Section 52.1 and Cal. Gov. Code §§ 815.2 and 820. Under § 820 of the Government Code, as public employees, Defendant HEIDECKER is liable for injuries caused by his acts or omissions to the same extent as private persons. Under § 815.2 of the Government Code, as public entities, RCSD and COUNTY are liable for injuries caused by the acts or omissions of their employees committed within the course and scope of their employment. This claim for relief is not alleging direct liability against RCSD and COUNTY, only vicarious liability. *See* Gov. Code, § 815.2, subds. (a), (b); *see also Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1128.

286. By his act and omissions, Defendants HEIDECKER and VACA, through threat, intimidation, and/or coercion, interfered with, attempted to interfere with, and violated Plaintiffs rights under California Civil Code § 52.1 and under the United States Constitution and California Constitution as follows:

A. To be free from bodily harm pursuant to Cal. Civ. Code § 43;

///

64

**CONSOLIDATED SECOND AMENDED COMPLAINT**

Deleted: ELEVENTH

Formatted: Font: 14 pt, Font color: Text 1

Formatted: Normal, No bullets or numbering

Deleted: FIRST

B. The right to be free from governmental interference as secured by the Fourteenth Amendments to the United States Constitution and by California Constitution, Article 1, §§ 7 and 13;

C. The right to enjoy and defend life and liberty; acquire, possess, and protect property; and pursue and obtain safety, happiness, and privacy, as secured by the California Constitution, Article 1, § 1.

287. Defendant HEIDECKER's and VACA's violations of Plaintiffs' due process rights with deliberate indifference, in and of themselves constitute violations of the Bane Act.

288. Alternatively, separate from, and above and beyond, Defendants Defendant HEIDECKER'S attempted interference, interference with, and violation of Plaintiffs' rights as described above, Defendant violated Plaintiff Plaintiffs' rights by the following conduct constituting threat, intimidation, or coercion:

A. Contacting RASP participants while on duty for non-law enforcement purposes;

B. Sexually grooming RASP participants;

C. Sexually preying upon RASP participants;

D. Sexually exploiting RASP participants;

E. Taking advantage of RASP participants for sexual purposes;

F. Improperly overseeing female RASP participants;

G. Using personal cell phones to communicate with RASP participants;

H. Engaging in sexually improper conduct while on duty such as making a video entitled "Big Dick Deputies"

289. Alternatively, separate from, and above and beyond, Defendants Defendant VACA's attempted interference, interference with, and violation of Plaintiff Plaintiffs' rights as described above, Defendant violated Plaintiffs' rights by the following conduct constituting threat, intimidation, or coercion:

A. Ignoring improper communications on SENTINEL cellular phones;

65

**CONSOLIDATED SECOND AMENDED COMPLAINT**

Deleted: ///¶

Deleted: FIRST

    B. Ignoring sexual communications between RCSD deputies and RASP participants on SENTINEL cellular phones;

    C. Failing to report improper communications on SENTINEL cellular phones;

    D. Failing to report sexual communications between RCSD deputies and RASP participants on SENTINEL cellular phones;

    E. Having a romantic relations with RCSD deputies; and

    F. Having a sexual relations with RCSD deputies.

290.    Further, all of Defendant's violations of duties and rights, and coercive conduct, described herein were volitional acts; none was accidental or merely negligent.

291.    Further, Defendant HEIDECKER and VACA violated Plaintiff's rights with reckless disregard and with the specific intent and purpose to deprive her of their enjoyment of those rights and of the interests protected by those rights.

292.    As a direct and proximate result of these Defendants HEIDECKER, VACA and DOES 1-10' conduct, Plaintiffs sustained injuries and damages.

293.    As a direct and proximate result of Defendants HEIDECKER's and VACA's violation of California Civil Code § 52.1 and of Plaintiff's rights under the Civil Code, United States and California Constitutions, Plaintiff sustained injuries and damages, and against each and every Defendant is entitled to relief, including punitive damages against all individual Defendants, and all damages allowed by California Civil Code §§ 52 and 52.1 and California law, not limited to a multiplier of damages including treble damages, costs attorneys' fees, and civil penalties.

294.    Defendant SENTINEL is liable for Defendant VACA's conduct under the doctrine of *respondeat superior*. *See Perez v. Van Groningen & Sons ,Inc*. (1986) 41 Cal.3d 962, 967.

///

///

**CONSOLIDATED SECOND AMENDED COMPLAINT**

Formatted: Font: 14 pt, Font color: Text 1

Formatted: Normal, No bullets or numbering

Deleted: FIRST

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully requests that the Court enter a judgment as follows:

A.    For economic and non-economic damages including but not limited to Plaintiff's physical, mental, and emotional pain and suffering, as well as all past, present, and future related medical expenses, in an amount according to proof at trial;

B.    For a multiplier of damages, including treble damages, as authorized under both Cal. Civ. Code § 52 and § 52.1;

C.    For civil penalties in the amount of $25,000 as authorized under both Cal. Civ. Code § 52 and§ 52.1;

D.    Damages and penalties pursuant to Civil Code Section § 1708.88;

E.    For punitive damages against the individual defendants in an amount to be proven at trial;

F.    For the reasonable attorneys' fees and costs allowed under 42 U.S.C. § 1988 and/or § 52 and § 52.1 in an amount to be proven at trial;

G.    For all other damages allowed under state and federal law, and;

H.    For such further relief as the Court may deem appropriate, proper, and just.

Dated: March 28, 2025          **GASTÉLUM LAW, APC**

By: _Denisse O. Gastélum_
Denisse O. Gastélum, Esq.
Attorneys for Plaintiff,
A.S., et al.

Dated: March 28, 2025          **LAW OFFICES OF CHRISTIAN CONTRERAS**
                               **A PROFESSIONAL LAW CORPORATION**

By: _____
Christian Contreras, Esq.
Attorneys for Plaintiff,
A.S., et al.

67

**CONSOLIDATED SECOND AMENDED COMPLAINT**

Dated: March 28, 2025    LAW OFFICES OF AARON L. TURNER, APC

By: /s/ Aaron Turner
Aaron Turner, Esq.
Attorney for Plaintiff,
O.C.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby make a demand for a jury trial in this action.

Dated: March 28, 2025    **GASTÉLUM LAW, APC**

By: _Denisse O. Gastélum_
Denisse O. Gastélum, Esq.
Attorneys for Plaintiff,
A.S., et al.

Dated: March 28, 2025    **LAW OFFICES OF CHRISTIAN CONTRERAS**
**A PROFESSIONAL LAW CORPORATION**

By: _Christian Contreras_
Christian Contreras, Esq.
Attorneys for Plaintiff,
A.S., et al.

Dated: March 28, 2025    LAW OFFICES OF AARON L. TURNER, APC

By: /s/ Aaron Turner
Aaron Turner, Esq.
Attorney for Plaintiff,
O.C.

68

**CONSOLIDATED SECOND AMENDED COMPLAINT**

Deleted: December 20, 2024
Deleted: ¶
Formatted: Justified, Indent: First line:  0.5", Add space between paragraphs of the same style
Deleted: December 20, 2024
Deleted: December 20, 2024
Deleted: December 20, 2024
Deleted: FIRST